IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **CRIMINAL NO.** |
| | ) | |
| v. | ) | **VIOLATIONS:** |
| | ) | WIRE FRAUD  (18 U.S.C. § 1343) |
| MICHAEL DAVID SCOTT, | ) | BANK FRAUD (18 U.S.C. § 1344) |
| Defendant | ) | UNLAWFUL MONETARY TRANSACTION |
| | ) | (18 U.S.C. § 1957) |
| | ) | AIDING AND ABETTING (18 U.S.C. § 2) |
| | ) | FORFEITURE (18 U.S.C. §§ 981, 982; |
| | ) | 28 U.S.C. §2461) |

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At times relevant to this Indictment:

### THE DEFENDANT

1.     Defendant Michael David Scott ("SCOTT") was an individual who resided in Mansfield, Massachusetts.

2.     SCOTT was the owner and operator of Southeast Properties, LLC ("Southeast Properties"), a real estate development company originally located at 465 Ashmont Street, Dorchester, Massachusetts, and subsequently located at 121 E. Berkeley Street, Boston, Massachusetts.

3.     SCOTT was also the owner and operator of M3 Realty Partners, LLC, ("M3 Realty") an apartment building management company located at 121 E. Berkeley Street, Boston, Massachusetts.

## THE MORTGAGE LENDERS

4.      Gateway Funding Diversified Mortgage Services, LP ("Gateway Funding") was a real estate mortgage company with a principal place of business at 300 Welsh Road, Horsham, Pennsylvania.

5.      New York Mortgage Company, LLC ("NYC Mortgage") was a real estate mortgage company with a principal place of business at 1301 Avenue of the Americas, New York, New York.

6.      Homecomings Financial, LLC ("Homecomings") was a real estate mortgage company with a principal place of business at 9 Sylvan Way, Parsippany, New Jersey.

7.      Citimortgage, Inc. ("Citimortgage") was a real estate mortgage company with a principal place of business at 1000 Technology Drive, O'Fallon, Missouri.

8.      Summit Mortgage, LLC ("Summit Mortgage") was a real estate mortgage company with a principal place of business at 301 Edgewater Place, Wakefield, Massachusetts.

9.      First Horizon Home Loans ("First Horizon") was a real estate mortgage company with a principal place of business at 4000 Horizon Way, Irving, Texas.

10.     National City Mortgage Corporation ("National City") was a real estate mortgage company with a principal place of business at 3232 Newmark Drive, Miamisburg, Ohio.

11.     Premium Capital Funding, LLC doing business as Topdot Mortgage ("Topdot Mortgage") was a real estate mortgage company with a principal place of business at 125 Jericho Turnpike, Jericho, New York.

12.     Washington Mutual Bank, FA ("Washington Mutual") was a real estate mortgage company with a principal place of business at 8880 Freedom Crossing Trail, Jacksonville, Florida.

13.     Salem Five Cents Savings Bank ("Salem Five") was a federally insured financial institution with a principal place of business at 210 Essex Street, Salem, Massachusetts.

14.     Gateway Funding, NYC Mortgage, Homecomings, Citimortgage, Summit Mortgage, First Horizon, National City, Salem Five, Topdot Mortgage and Washington Mutual are collectively referred to herein as "the mortgage lenders."

## THE STRAW BUYERS

15.     Individuals referred to herein as "T.R.", "L.F.", "A.D.", "P.J.", "D.T.", "A.F.", "J.G.", "K.B-S.", "M.S.#1", "A.S.#1", "A.S.#2", "G.H.", "R.H.", "C.B.", "C.G.", "S.V.", "M.T.", "T.M.", "M.P.", "S.S.#1", "S.D.", "E.B.", "J.D.", "L.R.", "S.S.#2", "M.S.#2", "A.P.", "D.S.", "J.A.", and "A.K." were persons who were recruited to serve as "straw buyers."

16.     As used in this Indictment, the term "straw buyer" refers to an individual in whose name real property was purchased and in whose name financing from the mortgage lenders was fraudulently obtained. In most instances, the straw buyers made no down payment, paid no closing costs, had no intention to reside in the real property, and had no personal capacity or personal intention to make the mortgage loan payments.

## THE SCHEME TO DEFRAUD

17.     Beginning in or about September of 2006 and continuing through in or about April of 2008, defendant SCOTT, acting in concert with associates of SCOTT known and unknown to the Grand Jury, engaged in a scheme to defraud the mortgage lenders and to obtain money, funds, credits, assets, and other property owned by and under the custody and control of the mortgage lenders by means of material false and fraudulent pretenses, representations and promises, in

3

connection with the financing of residential real estate purchases in Boston, Massachusetts, by "straw buyers" recruited by SCOTT and associates, known and unknown to the Grand Jury, acting in concert with SCOTT. The associates acting in concert with SCOTT included individuals who recruited others to act as "straw buyers," one or more bank or credit union officer who created fraudulent verifications of deposits in the names of "straw buyers," one or more mortgage originator and mortgage broker who assisted in the creation and submission of fraudulent mortgage loan applications in the names of "straw buyers,", and one or more closing attorney who closed fraudulent loans in the names of "straw buyers."

18.     It was a part of the scheme to defraud that SCOTT identified various multiple-family buildings to purchase for conversion to condominiums and for resale of the condominiums as individual units.

19.     It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, recruited straw buyers to purchase the condominiums as so-called investment properties.

20.     It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, promised straw buyers that the condominiums would be purchased in the names of the straw buyers without funds being paid by the straw buyers, that the properties would be maintained on behalf of the straw buyers, that tenants would be obtained on behalf of the straw buyers to rent the condominiums, and that the straw buyers would share in the anticipated profits when the condominiums were resold.

4

21.     It was further a part of the scheme to defraud that in some instances SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, paid fees to straw buyers for participating in the purchase of condominiums.

22.     It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, promised straw buyers that investor loans to finance the purchase of condominiums would be obtained from the mortgage lenders in the names of straw buyers.

23.     It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, promised the straw buyers that they would not have to make down payments and would not have to pay any other costs in connection with financing obtained from the mortgage lenders.

24.     It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, promised straw buyers that mortgage payments would be paid from income received by renting the condominiums.

25     It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, promised straw buyers that in the event rental income was not sufficient to cover mortgage payments, the payments would be made on behalf of the straw buyers for a period of time, including in some instances up to one year.

26.     It was further a part of the scheme to defraud that once straw buyers agreed to participate, SCOTT and certain associates of SCOTT, known and unknown to the Grand Jury, acting

5

in concert with SCOTT, engaged a mortgage loan broker and mortgage originator to prepare mortgage loan applications in the names of the straw buyers and to secure loans from the mortgage lenders.

27.     It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, caused mortgage loan applications to falsely represent inflated purchase prices for the condominiums.

28.     It was further a part of the scheme to defraud that in many instances SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, caused loan applications to falsely represent that straw buyers would own and occupy the condominiums as the straw buyers' "primary" or "secondary" residences, when in truth and in fact the condominium units were to be owned as investment rental properties.

29.     It was further a part of the scheme to defraud that in many instances SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, caused loan applications and supporting documents to falsely represent the straw buyers' assets.

30.     It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, caused mortgage loan applications and supporting documents to falsely represent that straw buyers had made down payments and would pay closing costs associated with the mortgage loans.

31.     It was further a part of the scheme to defraud that SCOTT and certain associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, arranged with an attorney to prepare loan closing documents and to conduct closings of mortgage loans in the names of the straw buyers.

6

32.      It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, caused the mortgage lenders to fund mortgage loans through wire transfers to the bank account of the closing attorney.

33.      It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, caused loan closing documents, including settlement statements known as HUD-1's, to falsely represent that straw buyers had made down payments and to falsely represent that the closing attorney collected closing costs from the straw buyers.

34.      It was further a part of the scheme to defraud that SCOTT and associates of SCOTT, known and unknown to the Grand Jury, acting in concert with SCOTT, caused mortgage loan proceeds to be disbursed from the closing attorney's account to SCOTT, in most instances to SCOTT's Bank of America account No. xxxxxxxx5111.

35.      It was further a part of the scheme to defraud that on various occasions after closings were conducted by the closing attorney and mortgage loan proceeds had been disbursed, SCOTT tendered to the closing attorney funds in amounts falsely represented on HUD-1 settlement statements as having been paid by straw buyers.

## EXECUTION OF THE SCHEME

### 78-80 GRANGER STREET
### Dorchester, Massachusetts

36.      On or about December 27, 2006, SCOTT bought a multi-family dwelling at 78-80 Granger Street in Dorchester, Massachusetts, for $ 504,000.

37.     In or about December 2006, SCOTT and associates acting in concert with SCOTT recruited T.R., L.F. and A.D. as straw buyers for condominium Units 1, 2 and 3, respectively. SCOTT and associates acting in concert with SCOTT assured T.R., L.F. and A.D. that they would not have to make a significant down payment or any down payment at all and would not have to pay any closing costs. SCOTT and associates acting in concert with SCOTT, further assured T.R., L.F., and A.D. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured T.R., L.F., and A.D. that they would share in the proceeds from the resale of the condominiums.

38.     In or about December 2006 and January 2007, T.R., L.F. and A.D. each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

39.     On or about December 29, 2006, T.R. purchased Unit No. 1 through a mortgage loan from Gateway Funding in the amount of $ 332,500. False representations in connection with the loan included representations that the purchase price was $ 350,000, that the unit was T.R.'s "secondary" residence, that T.R. owned a bank balance of $42,518.44 and that T.R. paid $17,939.09 at the closing.

40.     On or about December 29, 2006, L.F. purchased Unit No. 2 through first and second mortgage loans from NYC Mortgage in the aggregate amount of $ 315,000. False representations in connection with the loans included representations that the purchase price was $ 350,000, that the unit was L.F.'s "primary" residence and that L.F. paid $ 47,679.66 at the closing.

8

41.     On or about January 4, 2007, A.D. purchased Unit No. 3 through a mortgage loan from Gateway Funding in the amount of $ 332,500. False representations in connection with the loan included that the purchase price was $ 350,000, that the unit was A.D.'s "secondary" residence, that A.D. owned a bank balance of $ 37,112.54 and that A.D. paid $ 21,762.74 at the closing.

42.     From on or about December 29, 2006 to on or about January 4, 2007, Gateway Funding and NYC Mortgage wired funds to the closing attorney's account in connection with the purchases of 78-80 Granger Street Units 1, 2 and 3.

43.     From on or about January 2, 2007 to on or about January 8, 2007, the closing attorney disbursed loan proceeds to SCOTT and others.

44.     From on or about January 3, 2007 to on or about January 4, 2007, SCOTT tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by the straw buyers.

## 22 ELMORE STREET
### Roxbury, Massachusetts

45.     On or about January 3, 2007, a multi-family dwelling at 22 Elmore Street, Roxbury, Massachusetts was purchased in the name of E.J-S., wife of defendant SCOTT, for $ 326,000.

46.     In or about April 2007, SCOTT and  associates acting in concert with SCOTT recruited P.J. as a straw buyer for condominium Unit 1 and recruited D.T. as a straw buyer for condominium Units 2 and 3. SCOTT and associates acting in concert with SCOTT assured P.J. and D.T. that they would not have to make a significant down payment or any down payment at all and would not have to pay any closing costs. SCOTT and associates acting in concert with SCOTT further assured P.J. and D.T. that they would have no responsibility for making mortgage payments

9

for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding the subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured P.J. and D.T. that they would share in the proceeds from the resale of the condominiums.

47.     In or about April 2007, P.J. and D.T. agreed to participate in the purchases of Units 1, 2, and 3.

48.     On or about April 16, 2007, P.J. purchased Unit No. 1 through first and second mortgage loans from Gateway Funding in the aggregate amount of $ 333,000. False representations in connection with the loan included representations that the purchase price was $ 370,000, that P.J. made a down payment of $ 37,900, that the unit was P.J.'s "secondary" residence and that P.J. paid $ 3,001.21 at the closing.

49.     On or about April 16, 2007, D.T. purchased Unit No. 2 through first and second mortgage loans from Gateway Funding in the aggregate amount of $ 365,000. False representations in connection with the loan included representations that the purchase price was $ 365,000, that the unit was D.T.'s "primary" residence, that D.T. owned a bank balance of $ 45,218.85 and that D.T. paid $ 5,146,19 at the closing.

50.     On or about April 16, 2007, D.T. purchased Unit No. 3 through first and second mortgage loans from Gateway Funding in the aggregate amount of $ 328,500. False representations in connection with the loan included representations that the purchase price was $ 365,000, that D.T. owned a bank balance of $ 45,218.85 and that D.T. paid $ 42,654.95 at the closing.

51.     From on or about April 16, 2007 to on or about April 17, 2007, Gateway Funding wired funds to the closing attorney's account in connection with the purchases of 22 Elmore Street Units 1, 2 and 3.

52.     On or about April 16, 2007 the closing attorney disbursed loan proceeds to SCOTT and others.

53.     On or about April 17, 2007, SCOTT tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by the straw buyers.

### 365 CENTRE STREET
### Dorchester, Massachusetts

54.     On or about August 10, 2007, SCOTT purchased a multi-family dwelling at 365 Centre Street, Dorchester, Massachusetts for $ 460,000.

55.     In or about August 2007, SCOTT and associates acting in concert with SCOTT recruited A.F., J.G. and K.B-S. as straw buyers for condominium Units 1, 2 and 3, respectively. SCOTT and associates acting in concert with SCOTT assured A.F., J.G. and K.B-S. that they would not have to make a significant down payment or any down payment at all and would not have to pay any closing costs. SCOTT and associates acting in concert with SCOTT further assured A.F., J.G. and K.B-S. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured A.F., J.G. and K.B-S. that they would share in the proceeds from the resale of the condominiums.

11

56.     In or about August 2007, A.F., J.G. and K.B-S. each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

57.     On or about August 10, 2007, A.F. purchased Unit No. 1 through a mortgage loan from Gateway Funding in the amount of $ 260,100.  False representations in connection with the loan included representations that the purchase price was $ 289,000, that A.F. made a down payment of $ 29,400, that the unit was A.F.'s "secondary" residence and that A.F. paid $ 28,746.67 at the closing.

58.     On or about August 10, 2007, J.G. purchased Unit No. 2  through a mortgage loan from Homecomings in the amount of $ 239,200.  False representations in connection with the loan included representations that the purchase price was $ 299,000, that J.G. made a down payment of $ 29,400, that the unit was J.G.'s "primary" residence and that J.G. paid $ 43,620.68 at the closing.

59.     On or about August 10, 2007, K.B-S. purchased Unit No. 3 through a mortgage loan from Gateway Funding in the amount of $ 259,200.  False representations in connection with the loan included representations that the purchase price was $ 299,000, that K.B-S. made a down payment of $ 28,800 and that K.B-S. paid $ 45,232.01 at the closing.

60.     On or about August 10, 2007, Gateway Funding and Homecomings wired funds to the closing attorney's account in connection with the purchases of 365 Centre Street Units 1, 2 and 3.

61.     From on or about August 10, 2007 to on or about August 13, 2007, the closing attorney disbursed loan proceeds to SCOTT and others.

62.     From on or about August 13, 2007 to on or about August 17, 2007, SCOTT tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by the straw buyers.

12

## 81 SPENCER STREET
## Dorchester, Massachusetts

63.     On or about June 8, 2007, SCOTT purchased a multi-family dwelling at 81 Spencer Street, Dorchester, Massachusetts for $ 250,000.

64.     In or about August 2007, SCOTT and associates acting in concert with SCOTT recruited M.S.#1, A.F. and A.S.#1 as straw buyers for condominium Units 1, 2 and 3, respectively. SCOTT and associates acting in concert with SCOTT assured M.S.#1, A.F. and A.S.#1 that they would not have to make a significant down payment or any down payment at all and would not have to pay any closing costs. SCOTT and associates acting in concert with SCOTT further assured M.S.#1, A.F. and A.S.#1 that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured M.S.#1, A.F. and A.S.#1 that they would share in the proceeds from the resale of the condominiums.

65.     In or about August 2007, M.S.#1, A.F. and A.S.#1 each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

66.     On or about August 22, 2007, M.S.#1 purchased Unit No. 1 through a mortgage loan from Citimortgage in the amount of $ 169,150. False representations in connection with the loan included representations that the purchase price was $ 199,000, that M.S.#1. made a down payment of $ 19,900, that M.S.#1 owned a bank account balance of $ 113,400, that M.S.#1 owned real estate with a value of $ 588,700 and that M.S.#1 paid $ 15,002.37 at the closing.

13

67.     On or about August 24, 2007, A.F. purchased Unit No. 2 through a mortgage loan from Summit Mortgage in the amount of $ 191,250. False representations in connection with the loan included representations that the purchase price was $ 225,000, that A.F. made a down payment of $ 22,500 and that A.F. paid $ 18,310.52 at the closing.

68.     On or about August 21, 2007, A.S.#1 purchased Unit No. 3 through a mortgage loan from Gateway Funding in the amount of $ 202,500. False representations in connection with the loan included representations that the purchase price was $ 225,000, that A.S.#1.made a down payment of $ 22,500, that the unit was A.S.#1's "secondary" residence and that A.S.#1 paid $11,991.52 at the closing.

69.     From on or about August 22, 2007 to on or about August 27, 2007, Citimortgage, Summit Mortgage and Gateway Funding wired funds to the closing attorney's account in connection with the purchases of 81 Spencer Street Units 1, 2 and 3.

70.     From on or about August 22, 2007 to on or about August 27, 2007, the closing attorney disbursed loan proceeds to SCOTT and others.

71.     From on or about August 24, 2007 to on or about August 28, 2007, SCOTT tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by the straw buyers.

### 10 NAVILLUS TERRACE
### Dorchester, Massachusetts

72.     On or about September 27, 2007, SCOTT purchased a multi-family dwelling at 10 Navillus Terrace, Dorchester, Massachusetts for $ 469,200.

14

73.    In or about September 2007, SCOTT and associates acting in concert with SCOTT recruited A.S.#2, G.H., and R.H. as straw buyers for condominium Units 1, 2 and 3, respectively. SCOTT and associates acting in concert with SCOTT assured A.S.#2, G.H., and R.H. that they would not have to make a significant down payment or any down payment at all and would not have to pay any closing costs. SCOTT and associates acting in concert with SCOTT further assured A.S.#2, G.H., and R.H. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured A.S.#2, G.H., and R.H. that they would share in the proceeds from the resale of the condominiums.

74.    In or about September 2007, A.S.#2, G.H., and R.H. each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

75.    On or about September 28, 2007, A.S.#2 purchased Unit No. 1 through a mortgage loan from First Horizon in the amount of $ 258,750. False representations in connection with the loan included representations that the purchase price was $ 345,000, that A.S.#2 made a down payment of $ 86,250, that A.S.#2 owned a bank account balance of $ 120,000 and that A.S.#2 paid $ 5,090.62 at the closing.

76.    On or about September 28, 2007, G.H. purchased Unit No. 2 through a mortgage loan from Salem Five in the amount of $ 258,750. False representations in connection with the loan included representations that the purchase price was $ 345,000, that G.H. made a down payment of $ 86,250 and that G.H. paid $ 5,574.98 at the closing.

15

77.     On or about September 27, 2007, R.H. purchased Unit No. 3 through a mortgage loan from Salem Five in the amount of $ 258,750. False representations in connection with the loan included representations that the purchase price was $ 345,000, that R.H. made a down payment of $ 86,250, that the unit was R.H.'s "secondary" residence and that R.H. paid $ 5,801.26 at the closing.

78.     On or about September 28, 2007, First Horizon wired funds to an account in Providence, Rhode Island, which funds were further wired to the closing attorney's account in connection with the purchase of 10 Navillus Terrace Unit 1, and Salem Five wired funds to the closing attorney's account in connection with the purchases of 10 Navillus Terrace Units 2 and 3.

79.     From on or about September 27, 2007 to on or September 28, 2007, the closing attorney disbursed loan proceeds to SCOTT and others.

80.     On or about September 27, 2007, SCOTT and others tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statement as having been previously paid by the straw buyer for Unit 1. On or about October 1, 2007, SCOTT and others tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by the straw buyers for Units 2 and 3.

## 5 PARKMAN STREET
### Dorchester, Massachusetts

81.     On or about September 21, 2007, SCOTT purchased a multi-family dwelling at 5 Parkman Street, Dorchester, Massachusetts for $ 790,000.

82.     In or about September 2007, SCOTT and associates acting in concert with SCOTT recruited C.B., C.G., S.V., M.T., T.M., and M.P. as straw buyers for condominium Units 1L, 1R, 2L, 2R, 3L and 3R, respectively. SCOTT and associates acting in concert with SCOTT assured C.B.,

C.G., S.V., M.T., T.M., and M.P. that they would not have to make a significant down payment or any down payment at all and would not have to pay any closing costs. SCOTT and associates acting in concert with SCOTT further assured C.B., C.G., S.V., M.T., T.M., and M.P. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured C.B., C.G., S.V., M.T., T.M., and M.P. that they would share in the proceeds from the resale of the condominiums.

83.     In or about September 2007, C.B., C.G., S.V., M.T., T.M., and M.P. each agreed to participate in the purchases of Units 1L, 1R, 2L, 2R, 3L and 3R, respectively.

84.     On or about September 21, 2007, C.B. purchased Unit No. 1L through a mortgage loan from First Horizon in the amount of $ 192,750. False representations in connection with the loan included representations that the purchase price was $ 257,000, that C.B. made a down payment of $ 25,700, that C.B. owned a bank account balance of $ 114,000 and that C.B. paid $ 38,567.02 at the closing.

85.     On or about September 21, 2007, C.G. purchased Unit No. 1R through a mortgage loan from First Horizon in the amount of $ 195,500. False representations in connection with the loan included representations that the purchase price was $ 262,000, that C.G. made a down payment of $ 26,200, that C.G. owned a bank account balance of $ 74,000 and that C.G. paid $ 40,300.00 at the closing.

86.     On or about September 21, 2007, S.V. purchased Unit No. 2L through a mortgage loan from First Horizon in the amount of $ 220,915. False representations in connection with the

17

loan included representations that the purchase price was $ 259,900, that S.V. made a down payment of $ 25,990, that the unit was S.V.'s "secondary" residence, that S.V. owned a bank account balance of $ 50,000, and that S.V. paid $ 12,995.00 at the closing.

87.     On or about September 21, 2007, M.T. purchased Unit No. 2R through a mortgage loan from Salem Five in the amount of $ 224,900. False representations in connection with the loan included representations that the purchase price was $ 299,900, that M.T. made a down payment of $26,100, that the unit was M.T.'s "primary" residence and that M.T. paid $50,980.04 at the closing.

88.     On or about September 21, 2007, T.M. purchased Unit No. 3L through a mortgage loan from Salem Five in the amount of $ 224,925. False representations in connection with the loan included representations that the purchase price was $ 299,900, that T.M. made a down payment of $ 26,090 and that T.M. paid $ 51,502.99 at the closing.

89.     On or about September 21, 2007, M.P. purchased Unit No. 3R through a mortgage loan from First Horizon in the amount of $ 234,900. False representations in connection with the loan included representations that the purchase price was $ 261,000, that M.P. made a down payment of $ 26,100, that the unit was M.P.'s "secondary" residence, that M.P. owned a bank account balance of $ 160,000, and that M.P. paid $ 106.69 at the closing.

.      90.     On or about September 21, 2007, First Horizon and Salem Five wired funds to the closing attorney's account in connection with the purchases of 5 Parkman Street Units 1L, 1R, 2L, 2R, 3L and 3R.

91.     From on or about September 21, 2007 to or about September 24, 2007, the closing attorney disbursed loan proceeds to SCOTT and others.

18

92.     On or about September 25, 2007, SCOTT tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by the straw buyers.

### 3 PARKMAN STREET
### Dorchester, Massachusetts

93.     On or about October 10, 2007, SCOTT purchased a multi-family dwelling at 3 Parkman Street, Dorchester, Massachusetts for $ 700,000.

94.     In or about October 2007, SCOTT and associates acting in concert with SCOTT recruited S.S.#1, S.D., E.B., G.H., J.D. and L.R., as straw buyers for condominium Units 1L, 1R, 2L, 2R, 3L and 3R, respectively. SCOTT and associates acting in concert with SCOTT assured S.S.#1, S.D., E.B., G.H., J.D. and L.R. that they would not have to make a significant down payment or any down payment at all and would not have to pay any closing costs. SCOTT and associates acting in concert with SCOTT further assured S.S.#1, S.D., E.B., G.H., J.D. and L.R. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured S.S.#1, S.D., E.B., G.H., J.D. and L.R. that they would share in the proceeds from the resale of the condominiums.

95.     In or about October 2007, S.S.#1, S.D., E.B., G.H., J.D. and L.R. each agreed to participate in the purchases of Units 1L, 1R, 2L, 2R, 3L and 3R, respectively.

96.     On or about October 10, 2007, S.S.#1 purchased Unit No. 1L through a mortgage loan from Salem Five in the amount of $ 205,125. False representations in connection with the loan

19

included representations that the purchase price was $ 273,500, that S.S.#1 made a down payment of $ 5,000, that the unit was S.S.#1's "secondary" residence and that S.S.#1 paid $ 75,122.64 at the closing.

97.     On or about October 10, 2007, S.D. purchased Unit No. 1R through a mortgage loan from Salem Five in the amount of $ 202,425. False representations in connection with the loan included representations that the purchase price was $ 269,900, that S.D. made a down payment of $ 3,900, that the unit was S.D.'s "secondary" residence and that S.D. paid $75,201.00 at the closing.

98.     On or about October 12, 2007, E.B. purchased Unit No. 2L through a mortgage loan from First Horizon in the amount of $ 203,625. False representations in connection with the loan included representations that the purchase price was $ 271,500, that E.B. made a down payment of $ 67,875, that E.B. owned a bank account balance of $ 123,419.07, that E.B. paid $ 8,314.02 at the closing and that E.B. earned wages of $ 10,833.33 per month as an employee of Southeast Properties.

99.     On or about October 10, 2007, G.H.. purchased Unit No. 2R through a mortgage loan from Salem Five in the amount of $ 200,400. False representations in connection with the loan included representations that the purchase price was $ 267,250, that G.H. made a down payment of $ 4,000 and that G.H. paid $ 70,048.54 at the closing.

100.     On or about October 11, 2007, J.D. purchased Unit No. 3L through a mortgage loan from First Horizon in the amount of $ 217,200. False representations in connection with the loan included representations that the purchase price was $ 271,500, that J.D. made a down payment of $ 4,000, that the unit was J.D.'s "secondary" residence, that J.D. owned a bank account balance of $ 69,000 and that J.D. paid $ 54,314.60 at the closing.

101.    On or about October 10, 2007, L.R. purchased Unit No. 3R through a mortgage loan from First Horizon in the amount of $ 217,200. False representations in connection with the loan included representations that the purchase price was $ 271,500, that L.R. made a down payment of $ 3,500, that the unit was L.R.'s "secondary" residence, that L.R. owned a bank account balance of $ 110,000 and that L.R. paid $ 54,928.63 at the closing.

102.    From on or about October 10, 2007 to on or about October 12, 2007, First Horizon and Salem Five wired funds to the closing attorney's account in connection with the purchases of 3 Parkman Street Units 1L, 1R, 2L, 2R, 3L and 3R.

103.    From on or about October 10, 2007 to on or about October 12, 2007, the closing attorney disbursed loan proceeds to SCOTT and others.

104.    From on or about October 11, 2007 to on or about October 15, 2007, SCOTT tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by the straw buyers.

### 7 PARKMAN STREET
### Dorchester, Massachusetts

105.    On or about October 12, 2007, SCOTT purchased a multi-family dwelling at 7 Parkman Street, Dorchester, Massachusetts for $ 690,000.

106.    From in or about October 2007 to in or about April 2008, SCOTT and associates acting in concert with SCOTT recruited S.S.#2, A.S.#2, M.S.#2, A.P., D.S. and J.A. as straw buyers for condominium Units 1L, 1R, 2L, 2R, 3L and 3R, respectively. SCOTT and associates acting in concert with SCOTT assured S.S.#2, A.S.#2, M.S.#2, A.P., D.S. and J.A. that they would not have to make a significant down payment or any down payment at all and would not have to pay any

21

closing costs. SCOTT and associates acting in concert with SCOTT further assured S.S.#2, A.S.#2, M.S.#2, A.P., D.S. and J.A. that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured S.S.#2, A.S.#2, M.S.#2, A.P., D.S. and J.A. that they would share in the proceeds from the resale of the condominiums.

107.   From in or about October 2007 to in or about April 2008, S.S.#2, A.S.#2, M.S.#2, A.P., D.S. and J.A. each agreed to participate in the purchases of Units 1L, 1R, 2L, 2R, 3L and 3R, respectively.

108.   On or about April 18, 2008, S.S.#2 purchased Unit No. 1L through a mortgage loan from National City in the amount of $ 246,600. False representations in connection with the loan included representations that the purchase price was $ 274,000, that S.S.#2 made a down payment of $ 29,000, that the unit was S.S.#2's "primary" residence and that S.S.#2 owned a bank account balance of $ 12,401.50.

109.   On or about October 12, 2007, A.S.#2 purchased Unit No. 1R through a mortgage loan from Salem Five in the amount of $ 217,200. False representations in connection with the loan included representations that the purchase price was $ 271,500, that A.S.#2 made a down payment of $ 2,500 and that A.S.#2 paid $ 59,958.34 at the closing.

110.   On or about October 12, 2007, M.S.#2 purchased Unit No. 2L through a mortgage loan from Salem Five in the amount of $ 201,375. False representations in connection with the loan

22

included representations that the purchase price was $ 268,500, that M.S.#2 made a down payment of $ 53,700 and that M.S.#2 paid $ 20,472.91 at the closing.

111.    On or about October 12, 2007, A.P. purchased Unit No. 2R through a mortgage loan from Salem Five in the amount of $ 205,125. False representations in connection with the loan included representations that the purchase price was $ 273,500, that A.P. made a down payment of $ 68,375, that the unit was A.P.'s "secondary" residence and that A.P. paid $ 6,782.94 at the closing.

112.    On or about October 12, 2007, D.S. purchased Unit No. 3L through a mortgage loan from Salem Five in the amount of $ 205,125. False representations in connection with the loan included representations that the purchase price was $ 273,500, that D.S. made a down payment of $ 5,000, that the unit was D.S.'s "secondary" residence, that J.D.'s employment income was $ 8,500 per month and that D.S. paid $ 75,095.01 at the closing.

113.    On or about October 12, 2007, J.A. purchased Unit No. 3R through a mortgage loan from Salem Five in the amount of $ 194,925. False representations in connection with the loan included representations that the purchase price was $ 259,900, that J.A. made a down payment of $ 25,990, that the unit was J.A.'s "secondary" residence and that J.A. paid $ 41,322.10 at the closing.

114.    On or about October 12, 2007, Salem Five wired funds to the closing attorney's account in connection with the purchases of 7 Parkman Street Units 1R, 2L, 2R, 3L and 3R. On or about April 18, 2008, National City wired funds to the closing attorney's account in connection with the purchase of 7 Parkman Unit 1L.

115.    On or about October 12, 2007 and on or about April 18, 2008, the closing attorney disbursed loan proceeds to SCOTT and others.

116.    On or about October 15, 2007, SCOTT tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by straw buyers.

<strong>672 ADAMS STREET<br>Dorchester, Massachusetts</strong>

117.    On or about April 25, 2008, SCOTT bought a multi-family dwelling at 672 Adams Street in Dorchester, Massachusetts, for $ 435,000.

118.    In or about April 2008, SCOTT and associates acting in concert with SCOTT recruited A.K., S.S.#2, and A.S.#2 as straw buyers for condominium Units 1, 2 and 3, respectively. SCOTT and associates acting in concert with SCOTT assured A.K., S.S.#2, and A.S.#2 that they would not have to make a significant down payment or any down payment at all and would not have to pay any closing costs. SCOTT and associates acting in concert with SCOTT further assured A.K., S.S.#2, and A.S.#2 that they would have no responsibility for making the mortgage payments for a period of time, making repairs, finding tenants to rent the condominiums, collecting rent, applying rental income to property costs, or finding subsequent buyers for resale of the condominiums. SCOTT and associates acting in concert with SCOTT further assured A.K., S.S.#2, and A.S.#2 that they would share in the proceeds from the resale of the condominiums.

119.    In or about April 2008, A.K., S.S.#2, and A.S.#2 each agreed to participate in the purchases of Units 1, 2, and 3, respectively.

120.    On or about April 29, 2008, A.K. purchased Unit No. 1 through a mortgage loan from Washington Mutual in the amount of $ 232,000. False representations in connection with the

24

loan included representations that the purchase price was $ 290,000, that A.K. made a down payment of $ 29,000 and that A.K. paid $ 33,773.99 at the closing.

121.    On or about April 25, 2008, S.S.#2 purchased Unit No. 2 through a mortgage loan from Topdot Mortgage in the amount of $ 217,500.  False representations in connection with the loan included representations that the purchase price was $ 290,000, that S.S.#2 made a down payment of $ 29,000, that S.S.#2 owned a bank account balance of $ 92,000 and that S.S.#2 paid $ 48,257.81 at the closing.

122.    On or about April 25, 2008, A.S.#2 purchased Unit No. 3 through a mortgage loan from National City in the amount of $ 246,500.  False representations in connection with the loan included that the purchase price was $ 290,000, that the unit was A.S#2's "primary" residence, that A.S.#2 made a down payment of $ 45,500, that A.S.#2 owned a bank balance of $ 80,000 and that A.S.#2 paid $ 1,301.25 at the closing.

123.    From on or about April 22, 2008 to on or about April 29, 2008, Washington Mutual, Topdot Mortgage and National City wired funds to the closing attorney's account in connection with the purchases of 672 Adams Street Units 1, 2 and 3.

124.    From on or about April 25, 2008 to on or about April 30, 2008, the closing attorney disbursed loan proceeds to SCOTT and others.

125.    From on or about April 25, 2008, to on or about April 30, 2008, SCOTT tendered to the closing attorney funds that were falsely represented on the HUD-1 settlement statements as having been previously paid by the straw buyers.

## COUNTS ONE through TWENTY EIGHT
## (Wire Fraud – 18 U.S.C. §1343)

126.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 125 of this Indictment and further charges that:

127.   On or about the following dates, in the District of Massachusetts and elsewhere,

## MICHAEL DAVID SCOTT,

defendant herein, together with others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, did cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate commerce for the purpose of executing such scheme and artifice, to wit, wire transfers of fraudulently obtained mortgage loan proceeds, as follows:

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 1 | 12/29/2006 | 78-80 Granger Dorchester, MA Unit No. 1 | From the account of UBS AG at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $324,151.18 |
| 2 | 12/29/2006 | 78-80 Granger Dorchester, MA Unit No. 2 | From the account of Citibank, N.A. at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $278,288.28 |
| 3 | 12/29/2006 | 78-80 Granger Dorchester, MA Unit No. 2 | From the account of Citibank, N.A. at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $34,629.24 |

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 4 | 01/04/2007 | 78-80 Granger Dorchester, MA Unit No. 3 | From the account of UBS AG at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $323,678.11 |
| 5 | 04/17/2007 | 22 Elmore Street Roxbury, MA Unit No. 1 | From the account of Deutsche Bank Trust Co., Americas at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $288,767.14 |
| 6 | 04/17/2007 | 22 Elmore Street Roxbury, MA Unit No. 1 | From the account of Deutsche Bank Trust Co., Americas at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $35,109.86 |
| 7 | 04/17/2007 | 22 Elmore Street Roxbury, MA Unit No. 2 | From the account of UBS AG at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $280,945.22 |
| 8 | 04/17/2007 | 22 Elmore Street Roxbury, MA Unit No. 2 | From the account of Deutsche Bank Trust Co., Americas at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $72,326.25 |
| 9 | 04/17/2007 | 22 Elmore Street Roxbury, MA Unit No. 3 | From the account of Deutsche Bank Trust Co., Americas at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $283,785.22 |

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 10 | 04/17/2007 | 22 Elmore Street Roxbury, MA Unit No. 3 | From the account of Deutsche Bank Trust Co., Americas at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $35,544.99 |
| 11 | 08/10/2007 | 365 Centre Street Dorchester, MA Unit No. 1 | From the account of Deutsche Bank Trust Co., Americas at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $235,213.78 |
| 12 | 08/10/2007 | 365 Centre Street Dorchester, MA Unit No. 2 | From the account of JP Morgan Chase Bank, N.A. at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $235,320.55 |
| 13 | 08/10/2007 | 365 Centre Street Dorchester, MA Unit No. 3 | From the account of Deutsche Bank Trust Co., Americas at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $229,631.57 |
| 14 | 08/23/2007 | 81 Spencer Street Dorchester, MA Unit No. 1 | From the account of Citibank, N.A. at New York, New York<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $162,320.66 |
| 15 | 08/27/2007 | 81 Spencer Street Dorchester, MA Unit No. 2 | From the account of U.S. Bank, N.A. at St. Paul, Minnesota<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $181,846.46 |

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 16 | 08/22/2007 | 81 Spencer Street Dorchester, MA Unit No. 3 | From the account of U.S. Bank, N.A. at St. Paul, Minnesota<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $183,667.48 |
| 17 | 09/28/2007 | 10 Navillus Terrace Dorchester, MA Unit No. 1 | From account No. xxxxx38267 at RBS Citizens Bank at Providence, Rhode Island<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $244,965.33 |
| 18 | 09/21/2007 | 5 Parkman Street Dorchester, MA Unit No. 1L | From the account of First Tennessee Bank, N.A. at Memphis, Tennessee<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $191,200.51 |
| 19 | 09/21/2007 | 5 Parkman Street Dorchester, MA Unit No. 1R | From the account of First Tennessee Bank, N.A. at Memphis, Tennessee<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $193,939.76 |
| 20 | 09/21/2007 | 5 Parkman Street Dorchester, MA Unit No. 2L | From the account of First Tennessee Bank, N.A. at Memphis, Tennessee<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $214,533.42 |
| 21 | 09/21/2007 | 5 Parkman Street Dorchester, MA Unit No. 3R | From the account of First Tennessee Bank, N.A. at Memphis, Tennessee<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $227,501.84 |

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 22 | 10/12/2007 | 3 Parkman Street Dorchester, MA Unit No. 2L | From the account of First Tennessee Bank, N.A. at Memphis, Tennessee<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $192,575.66 |
| 23 | 10/11/2007 | 3 Parkman Street Dorchester, MA Unit No. 3L | From the account of First Tennessee Bank, N.A. at Memphis, Tennessee<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $210,452.91 |
| 24 | 10/10/2007 | 3 Parkman Street Dorchester, MA Unit No. 3R | From the account of First Tennessee Bank, N.A. at Memphis, Tennessee<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $210,416.71 |
| 25 | 04/18/2008 | 7 Parkman Street Dorchester, MA Unit No. 1L | From the account of National City Bank at Indianapolis, Indiana<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $242,489.12 |
| 26 | 04/29/08 | 672 Adams Street Dorchester, MA Unit No. 1 | From the account of J.P. Morgan Chase at Stockton, California<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $235,484.10 |
| 27 | 04/25/08 | 672 Adams Street Dorchester, MA Unit No. 2 | From the account of Colonial Bank, NA at Kissimmee, Florida<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $217,500.00 |

| Count | Date | Property | Wire Transfer | Amount |
|-------|------|----------|---------------|--------|
| 28 | 04/22/08 | 672 Adams Street Dorchester, MA Unit No. 3 | From the account of National City Bank at Indianapolis, Indiana<br><br>To the closing attorney account No. xxxxxx0057 at Central Cooperative Bank in Somerville, Massachusetts | $240,121.11 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS TWENTY NINE through FORTY
### (Bank Fraud – 18 U.S.C. §1344)

128.    The Grand Jury re-alleges and incorporates by reference paragraphs 1- 44 and 72 -

116 of this Indictment and further charges that:

129.    On or about the following dates, in the District of Massachusetts and elsewhere,

## MICHAEL DAVID SCOTT,

defendant herein, together with others known and unknown to the Grand Jury, knowingly executed

and attempted to execute a scheme and artifice to defraud Salem Five Cents Savings Bank, a

federally insured financial institution,  and to obtain moneys, funds, credits, assets, securities, and

other property owned by and under the custody and control of Salem Five Cents Savings Bank, by

means of false and fraudulent pretenses, representations and promises, concerning material facts and

matters in connection with the following mortgage loans:

| Count | Date | Mortgaged Property | Funds Obtained By Fraud |
|-------|------|--------------------|-------------------------|
| 29 | 09/28/2007 | 10 Navillus Terrace, Unit No. 2 in the name of G.H. | $ 247,390.88 |
| 30 | 09/28/2007 | 10 Navillus Terrace, Unit No. 3 in the name of R.H. | $ 248,633.24 |
| 31 | 09/21/2007 | 5 Parkman Street, Unit No. 2R in the name of M.T. | $ 215,497.49 |
| 32 | 09/21/2007 | 5 Parkman Street, Unit No. 3L in the name of T.M. | $ 214,959.20 |
| 33 | 10/10/2007 | 3 Parkman Street, Unit No. 1L in the name of S.S.#1 | $ 196,160.70 |
| 34 | 10/10/2007 | 3 Parkman Street, Unit No. 1R in the name of S.D. | $ 193,566.34 |

| Count | Date | Mortgaged Property | Funds Obtained By Fraud |
|-------|------|--------------------|--------------------------|
| 35 | 10/10/2007 | 3 Parkman Street, Unit No. 2R in the name of G.H.. | $ 190,615.80 |
| 36 | 10/12/2007 | 7 Parkman Street, Unit No. 1R in the name of A.S.#2 | $ 207,246.89 |
| 37 | 10/12/2007 | 7 Parkman Street, Unit No. 2L in the name of M.S.#2 | $ 192,580.32 |
| 38 | 10/12/2007 | 7 Parkman Street, Unit No. 2R in the name of A.P. | $ 196,722.29 |
| 39 | 10/12/2007 | 7 Parkman Street, Unit No. 3L in the name of D.S. | $ 196,722.22 |
| 40 | 10/12/2007 | 7 Parkman Street, Unit No. 3R in the name of J.A. | $ 185,947.13 |

All in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNTS FORTY ONE through SIXTY TWO
### (Unlawful Monetary Transaction – 18 U.S.C. §1957)

130.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 125 of this Indictment, and further charges that:

131.   On or about the following dates, in the District of Massachusetts, and elsewhere,

## MICHAEL DAVID SCOTT,

the defendant herein, did knowingly engage and attempt to engage in a monetary transaction, by, through or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, the particulars of which are described below, and which was derived from a specified unlawful activity, that is, Wire Fraud, in violation of 18 U.S.C. §1343 and Bank Fraud in violation of 18 U.S.C. §1344:

| Count | Date | Specified Unlawful Activity | Transaction | Amount |
|-------|------|----------------------------|-------------|--------|
| 41 | 01/02/2007 | Wire Fraud Counts 1 through 4 in connection with 78-80 Granger Street, Dorchester, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To Bank of America account No. xxxxxxxx2539 in the names of MICHAEL D. SCOTT and E. J.-S. | $25,000.00 |
| 42 | 01/05/2007 | Wire Fraud Counts 1 through 4 in connection with 78-80 Granger Street, Dorchester, MA | Check No. 1248 drawn on Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Check payable to Triple J and negotiated at Bank of America | $35,000.00 |
| 43 | 01/05/2007 | Wire Fraud Counts 1 through 4 in connection with 78-80 Granger Street, Dorchester, MA | Check No. 1246 drawn on Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Check payable to Metro Property Partners and negotiated at Bank of America | $200,000.00 |

| Count | Date | Specified Unlawful Activity | Transaction | Amount |
|-------|------|-----------------------------|-------------|--------|
| 44 | 04/17/2007 | Wire Fraud Counts 5 through 10 in connection with 22 Elmore Street, Roxbury, MA | Debit Withdrawal from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Credit Deposit to Southeast Properties account No. xxxxxxxx3053 at Bank of America | $35,000.00 |
| 45 | 04/17/2007 | Wire Fraud Counts 5 through 10 in connection with 22 Elmore Street, Roxbury, MA | Debit Withdrawal from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Credit Deposit to M3 Realty account No. xxxxxxxx5633 at Bank of America | $30,000.00 |
| 46 | 04/19/2007 | Wire Fraud Counts 5 through 10 in connection with 22 Elmore Street, Roxbury, MA | Check No. 1254 drawn on Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Check payable to W.S. and negotiated at Citizens Bank, N.A. | $33,089.80 |
| 47 | 04/20/2007 | Wire Fraud Counts 5 through 10 in connection with 22 Elmore Street, Roxbury, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To Massachusetts Department of Revenue negotiated at Sovereign Bank | $37,000.00 |
| 48 | 04/23/2007 | Wire Fraud Counts 5 through 10 in connection with 22 Elmore Street, Roxbury, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To American Express Credit Card No. xxxxxxxxxxxxx1008 in the name of E.S. deposited at Wachovia Bank, N.A. | $25,000.00 |

| Count | Date | Specified Unlawful Activity | Transaction | Amount |
|---|---|---|---|---|
| 49 | 08/13/2007 | Wire Fraud Counts 11 through 13 in connection with 365 Centre Street, Dorchester, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To American Express Credit Card No. xxxxxxxxxxxxx1008 in the name of E.S. deposited at Wachovia Bank, N.A. | $25,000.00 |
| 50 | 08/16/2007 | Wire Fraud Counts 11 through 13 in connection with 365 Centre Street, Dorchester, MA | Withdrawal of funds from Southeast Properties account No. xxxxxxx5111 at Bank of America for purchase of Bank of America Official Check No. 0888395<br><br>Check payable to McElhiney & Matson, Attorneys and negotiated at Citizens Bank, N.A. | $ 41, 318.84 |
| 51 | 08/27/2007 | Wire Fraud Counts 14 through 16 in connection with 81 Spencer Street Dorchester, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To Bank of America account No. Xxxxxxxx3053 in the name of Southeast Properties | $15,000.00 |
| 52 | 08/28/2007 | Wire Fraud Counts 14 through 16 in connection with 81 Spencer Street, Dorchester, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To Bank of America account No. Xxxxxxxx3053 in the name of Southeast Properties | $ 20,000.00 |
| 53 | 09/24/2007 | Wire Fraud Counts 18 through 21 and Bank Fraud Counts 31 through 32 in connection with 5 Parkman Street Dorchester, MA | Check No. 1884 drawn on Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Check payable to K.A. and negotiated at Central Co-Operative Bank | $15,000.00 |

| Count | Date | Specified Unlawful Activity | Transaction | Amount |
|-------|------|----------------------------|-------------|--------|
| 54 | 09/24/2007 | Wire Fraud Counts 18 through 21 and Bank Fraud Counts 31 through 32 in connection with 5 Parkman Street Dorchester, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To Bank of America account No. Xxxxxxxx3053 in the name of Southeast Properties | $61,000.00 |
| 55 | 09/24/2007 | Wire Fraud Counts 18 through 21 and Bank Fraud Counts 31 through 32 in connection with 5 Parkman Street Dorchester, MA | Withdrawal Debit from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Deposit Credit to Bank of America Account No. xxxxxxx6219 in the name of MICHAEL DAVID SCOTT | $ 85,000.00 |
| 56 | 09/28/2007 | Wire Fraud Counts 18 through 21 and Bank Fraud Counts 31 through 32 in connection with 5 Parkman Street Dorchester, MA | Check No. 1895 drawn on Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Check payable to MICHAEL DAVID SCOTT and negotiated at Bank of America | $ 41,000.00 |
| 57 | 10/15/2007 | Wire Fraud Counts 22 through 24 and Bank Fraud Counts 33 through 35 in connection with 3 Parkman Street Dorchester, MA | Debit Withdrawal from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Credit Deposit to Visa account at Bank of America | $ 75,095.01 |
| 58 | 10/17/2007 | Wire Fraud Counts 22 through 24 and Bank Fraud Counts 33 through 35 in connection with 3 Parkman Street Dorchester, MA | Check No. 1931 drawn on Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Check payable to MICHAEL DAVID SCOTT and negotiated at Bank of America | $ 51,000.00 |

| Count | Date | Specified Unlawful Activity | Transaction | Amount |
|-------|------|----------------------------|-------------|--------|
| 59 | 10/31/2007 | Wire Fraud Counts 22 through 24 and Bank Fraud Counts 33 through 35 in connection with 3 Parkman Street Dorchester, MA | Debit Withdrawal from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>Credit Deposit to Visa account at Bank of America | $ 12,000.00 |
| 60 | 10/12/2007 | Wire Fraud Count 25 and Bank Fraud Counts 36 through 40 in connection with 7 Parkman Street, Dorchester, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To Bank of America account No. Xxxxxxx4866 in the name of Southeast Properties | $ 11,000.00 |
| 61 | 10/15/2007 | Wire Fraud Count 25 and Bank Fraud Counts 36 through 40 in connection with 7 Parkman Street, Dorchester, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To Bank of America account No. Xxxxxxx03053 in the name of Southeast Properties | $ 25,500.00 |
| 62 | 10/15/2007 | Wire Fraud Count 25 and Bank Fraud Counts 36 through 40 in connection with 7 Parkman Street, Dorchester, MA | Electronic funds transfer from Southeast Properties account No. xxxxxxx5111 at Bank of America<br><br>To Bank of America account No. Xxxxxxx4866 in the name of Southeast Properties | $ 20,000.00 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE ALLEGATIONS
(18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2)(A) and 28 U.S.C. § 2461(c))

132.    Upon conviction of one or more of the offenses alleged in Counts One through Twenty-Eight of this Indictment, the defendant,

### MICHAEL DAVID SCOTT,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offenses.

133.    If any of the property described in paragraph 132, above, as a result of any act or omission of the defendant –

a..  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of this Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 28 U.S.C. § 2461(c), incorporating 21 U.S.C. §853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in  subparagraphs (a) through (e) of this paragraph.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

134.    Upon conviction of one or more of the offenses alleged in Counts Twenty-Nine through Forty of this Indictment, the defendant,

**MICHAEL DAVID SCOTT,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations.

135.    If any of the property described in paragraph 134, above, as a result of any act or omission of the defendant –

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred to, sold to, or deposited with a third party;

c.  has been placed beyond the jurisdiction of this Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. §853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in  subparagraphs (a) through (e) of this paragraph.

All pursuant to Title 18, United States Code, Section 982(a)(2)(A) and Title 28, United States Code, Section 2461(c).

136.   Upon conviction of one or more of the offenses alleged in Counts Forty-One through Sixty-Two of this Indictment, the defendant,

**MICHAEL DAVID SCOTT,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property.

137.   If any of the property described in paragraph 136, above, as a result of any act or omission of the defendant –

> a. cannot be located upon the exercise of due diligence;
>
> b. has been transferred to, sold to, or deposited with a third party;
>
> c. has been placed beyond the jurisdiction of this Court;
>
> d. has been substantially diminished in value; or
>
> e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. §853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in  subparagraphs (a) through (e) of this paragraph.

All pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_Carol Purdy_
FOREPERSON OF THE GRAND JURY

_Victor A. Wild_
VICTOR A. WILD
RYAN M. DISANTIS
Assistant United States Attorneys

DISTRICT OF MASSACHUSETTS

AUGUST ___26___, 2010

Returned into the District Court by the Grand Jurors and filed.

_Ana Belpedio_
11:34A
Deputy Clerk

42