UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Criminal No. 10-10264-RGS

UNITED STATES OF AMERICA

v.

MICHAEL DAVID SCOTT

**MEMORANDUM AND ORDER RE:**
**DEFENDANT MICHAEL DAVID SCOTT'S MOTION FOR DISCOVERY**
**(DOCKET ENTRY # 120)**

**June 17, 2013**

**BOWLER, U.S.M.J.**

After conducting a hearing, this court took the above styled motion (Docket Entry # 120) filed by the defendant Michael David Scott ("the defendant") under advisement.

PROCEDURAL BACKGROUND

A 68 count Superceding Indictment filed on September 16, 2010, charges the defendant with wire fraud, bank fraud and money laundering respectively in violation of 18 U.S.C. §§ 1343, 1344 and 1957. The charges originate from the defendant's ownership and operation of Southeast Properties, LLC ("Southeast Properties"), a real estate development company, and M3 Realty Partners, LLC ("M3 Realty"), an apartment management company, from September 2006 to April 2008. Along with two co-defendants, the defendant purportedly defrauded various mortgage lenders in connection with financing residential real estate purchases in Boston, Massachusetts.

The present discovery dispute involves representations made by the government in a February 23, 2009 proffer and materials seized by the government on March 22, 2012, during the execution of a search warrant at the offices of Verdolino & Lowery, P.C. ("Verdolino"), an accounting firm appointed to assist Trustee Warren Agin ("Agin") in connection with an April 30, 2009 chapter 7 bankruptcy filing by the defendant in this district.  See In re Michael D. Scott d/b/a Southeast Properties, Case Number 09-13820-WCH.  Pursuant to Local Rule 116.2(a), Fed. R. Crim. P. 16(a)(1)(E)(i) and Brady v. Maryland, 373 U.S. 83 (1963), the defendant seeks "an order directing the government to produce all evidence of communications between the government and" Agin "and individuals or entities working with him, including the accounting firm of Verdolino . . . concerning the materials" seized from Verdolino on March 22, 2012, pursuant to the search warrant.  (Docket Entry # 120).

<u>FACTUAL BACKGROUND</u>

During the course of the government's investigation of defendant, the parties entered into the February 2009 proffer agreement under which the government agreed that:

> 1.  No statements made or other information provided by Michael Scott, will be used by the United States Attorney directly against him except for purposes of cross-examination and/or impeachment . . . or in a prosecution of Michael Scott based on false statements made or false information provided by Michael Scott.
>
> 2.  The government may make derivative use of, or may pursue

2

any investigative leads suggested by, any statements made or
other information provided by Michael Scott in the course of
the proffer.  Any evidence directly or indirectly derived
from the proffer may be used against him and others in any
criminal case or other proceeding.  This provision is
necessary in order to eliminate the possibility of a hearing
at which the government would have to prove that the
evidence it would introduce is not tainted by any statements
made or other information provided during the proffer.  <u>See</u>
<u>Kastigar v. United States</u>, 406 U.S. 441 (1972).

(Docket Entry # 121-1).  The parties focus on the first

paragraph.  The introductory paragraph of the agreement

identifies that the defendant is currently under investigation

"in connection with conspiracy, bank fraud, mortgage fraud" and

money laundering.  (Docket Entry # 121-1).

　　After entering into the proffer, the defendant "provided

various documents relating to [the] real estate mortgage loans

under investigation" on "multiple occasions."  (Docket Entry #

121-2, ¶ 4).  On May 15, 2009, the defendant and his counsel at

the time authorized "a consensual search of Scott's computer

equipment" at his Boston office, according to the affidavit

attached to the March 21, 2012 application for the search warrant

("the affidavit").  (Docket Entry # 121-2, ¶ 4).  During the

search, federal agents took forensic images of a computer server

and a desktop computer.  "Forensic review of the images" yielded

"numerous electronic documents" and other evidence of the real

estate mortgage loans under investigation, according to the

affidavit.  (Docket Entry # 121-2, ¶ 4).

　　On August 26, 2010, an Indictment issued after plea

3

negotiations failed.  The Superceding Indictment issued the following month.

Meanwhile, a number of events took place in the ongoing bankruptcy proceeding.  In May 2009, the Office of the United States Trustee appointed Agin as trustee.  In July 2009, Agin obtained court approval authorizing the employment of Murtha Cullina, LLP ("Agin's counsel") as his counsel.  In September 2009, Agin procured court approval to employ Verdolino to perform accounting services for the estate.

On January 20, 2010, the defendant's bankruptcy counsel agreed to deliver computers and boxes of paper records to Agin. (Docket Entry # 130-1, ¶ 3).  On January 21, 2010, Agin, a Verdolino official, the defendant and the defendant's bankruptcy counsel met at the defendant's Boston office.  During the meeting, the defendant "produced multiple boxes of records." (Docket Entry # 121-2, ¶ 14(f)).  Verdolino took possession of these paper records and thereafter stored them in 29 boxes at Verdolino's office in Foxboro, Massachusetts.  (Docket Entry # 121-2, ¶¶ 14(e) & 15).  A partial inventory of these paper records identifies settlement statements, mortgage statements and property files.  (Docket Entry # 121-2, ¶ 14(j)).  Because the aforementioned forensic images of the server and the desktop computer include these same items, it is reasonable to assume there is a degree of overlap between the boxed paper records and

4

the electronic documents resulting from the May 15, 2009
purportedly "consensual search."[1]

Also on January 21, 2010, Verdolino obtained possession of
the defendant's aforementioned server.[2]  The next day, Verdolino
took images of the server and the defendant's laptop computer.
The company produced "two imaged copies," one for "forensic
analysis and the other for use as potential evidence."  (Docket
Entry # 130-1, ¶ 4).  Verdolino retained the forensic images of
the server and the laptop computer on two hard drives at its
Foxboro, Massachusetts office.  (Docket Entry # 121-2, ¶ 15).  A
forensic analysis of financial files on the server showed that a
number of the electronic documents relate to nine of the 12
properties in the Superceding Indictment and all of the
electronic documents carried "a last modified date of February 6,
2009."  (Docket Entry # 121-2, ¶ 14(i)).  It is therefore
reasonable to assume that the images of files on the server and
located on a hard drive at Verdolino's office are identical to or
substantially overlap with the electronic documents produced from
the forensic images of the same server taken on May 15, 2009,

---

[1]  The parties do not maintain there is an absence of
overlap or duplication.

[2]  The affidavit identifies the date as "January 21, 2012."
(Docket Entry # 121-1, ¶ 14(e)).  This court assumes the date is
a typographical error because the affidavit also states that
Verdolino took images of the server on January 22, 2010, which is
the date repeatedly referenced by the parties.

during the "consensual search."[3]   (Docket Entry # 121-1, ¶¶ 4, 5, 14(e), 14(i), 17(a)).

In March 2010, personnel at the Office of the United States Trustee provided information to the FBI and an Assistant United States Attorney about possible bankruptcy fraud on the part of the defendant.   (Docket Entry # 121-2, ¶ 14(i)).   As a United States trustee, Agin has a responsibility to notify:

> the appropriate United States attorney of matters which relate to the occurrence of any action which may constitute a crime under the laws of the United States and, on the request of the United States attorney, assisting the United States attorney in carrying out prosecutions based on such action . . ..

28 U.S.C. § 586(a)(3)(F) ("section 586(a)"); see also 18 U.S.C. § 3057(a) ("section 3057").[4]   In May and July 2010, personnel at the Office of the United States Trustee provided additional information to one or more FBI agents and one or more Assistant

---

[3]   See footnote one.

[4]   Section 3057 states:

> Any judge, receiver, or trustee having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed, or that an investigation should be had in connection therewith, shall report to the appropriate United States attorney all the facts and circumstances of the case, the names of the witnesses and the offense or offenses believed to have been committed.   Where one of such officers has made such report, the others need not do so.

18 U.S.C. § 3057(a).

United States Attorneys.   The information included a list of the files from the two imaged copies and a two page "summary of preliminary observations by Verdolino."  (Docket Entry # 130-1, ¶¶ 8-9).

Between March 2010 and March 2012, a number of conversations took place involving Assistant United States Attorneys, FBI Special Agents and personnel at the Office of the United States Trustee.  (Docket Entry # 130-1, ¶ 6).  These conversations included matters involving the images and the paper records. (Docket Entry # 130-1, ¶ 6).

"On or about February 23, 2012, the United States Attorney's Office requested access for FBI and IRS agents involved in" this prosecution "to review the computer images and paper records." (Docket Entry # 130-1, ¶ 10).  On March 14, 2012, the bankruptcy court allowed an assented to motion to dismiss the petition.   In an email the same day, Agin's counsel asked the defendant's bankruptcy counsel to speak to the defendant about retrieving the documents and to confirm his understanding that "all remaining documents at [Verdolino] can be destroyed" after April 27, 2012. (Docket Entry # 121-3).  The defendant's bankruptcy counsel responded that the defendant could pick up the documents the next day at 1:00 p.m. or the following morning, March 16, 2012. Agin's counsel replied on March 14, 2012, that he would follow up with Verdolino.  Agin's counsel did not get back in touch with

the defendant's bankruptcy counsel until prompted by the latter's March 22, 2012 email.

During the interim period from March 14 to March 22, 2012, personnel at the Office of the United States Trustee provided the United States Attorney's Office with details about "the chronology of the delivery of computers and paper records" by the defendant to Agin, "the possession of imaged copies and paper records thereafter, and the current location and details[sic] descriptions of the computer images and paper records." (Docket Entry 130-1, ¶ 11). In addition to this description of the communications during this time period, the affidavit supporting the search warrant identifies two individuals by name at Verdolino who on March 20, 2012, informed the government about: (1) the forensic images of the server and the laptop computer contained on the two hard drives in Verdolino's office; and (2) the 29 boxes of paper records at the office.

On March 21, 2012, a Magistrate Judge signed the aforementioned search warrant application. The government seized the imaged copies and the paper records at Verdolino's office on March 22, 2012. Agin's counsel received the aforementioned email from the defendant's bankruptcy counsel that afternoon. In the reply email, Agin's counsel informed the defendant's bankruptcy counsel that the FBI removed the documents from Verdolino's office that day pursuant to the search warrant.

8

The bankruptcy court issued a notice of dismissal on March 29, 2012. The docket reflects a closure of the case on April 3, 2012.

## DISCUSSION

The defendant seeks an order for the government to produce all evidence of the communications between the government and Agin as well as individuals and entities working with Agin, including Verdolino. At the March 4, 2013 hearing on the motion, the defendant offered to limit the communications to the time period of February 1 to March 22, 2012. The defendant argues that the timing and the substance of the communications is relevant and material to an anticipated motion to suppress the materials consisting of the documents and the images. In seeking disclosure, the defendant relies on Local Rule 116.2(a), Local Rule 116.2(b)(1)(B), Fed. R. Crim. P. 16(a)(1)(E)(i) and Brady v. Maryland, 373 U.S. 83 (1963).

A prosecutor violates a defendant's due process constitutional rights under Brady "by failing to disclose material evidence in his possession that is favorable to the defendant." Drumgold v. Callahan, 707 F.3d 28, 38 (1st Cir. 2013). "Evidence is favorable to a defendant if it is either exculpatory or impeaching in nature," Id. at 38-39, "and 'material'" in the sense that "there is a reasonable probability that, had it been disclosed, the result of the proceeding would

9

have been different." <u>United States v. Prochilo</u>, 629 F.3d 264,
268 (1st Cir. 2011).  Local Rule 116.2(a) defines "exculpatory
information" as information "that is material and favorable" to
the defendant "because it tends to . . . [c]ast doubt on the
admissibility of evidence that the government anticipates using
in its case-in-chief" or "that might be subject to a motion to
suppress or exclude."  LR. 116.2(a).

The defendant intends to seek suppression of the images and
the documents "for two reasons."  (Docket Entry # 121).  First,
he argues that the affidavit supporting the search warrant was
defective because "the government used information that it
obtained from [the defendant] directly against him in violation
of the proffer agreement between the parties."  (Docket Entry #
121).  Second, Agin or his agents were, in fact, acting as
government agents when they retained custody of the images and
the documents without a warrant after the bankruptcy court
allowed the motion to dismiss on March 14, 2012, according to the
defendant.  (Docket Entry # 121).  In the event the February 1 to
March 22, 2012 communications between the United States
Attorney's Office and Agin or his agents are material and cast
doubt on the admissibility of the material in the government's
case-in-chief or could be subject to a motion to suppress, Local
Rule 116.2(B)(1)(b) requires production.[5]

---

[5] The arraignment took place in September 2010.

A.  Violation of Proffer Agreement

Citing United States v. Siciliano, 57 8 F.3d 61, 68 (1st

Cir. 2009), the defendant argues that:

> Where, as here, a warrant is supported by an affidavit
> containing unlawfully obtained – or in this case, unlawfully
> used – information, the warrant's issuance can only be
> supported if the government can prove that (1) the agents'
> decision to seek the warrant was not prompted by their
> review of the unlawful information and (2) the warrant
> contained sufficient facts to support probable cause when
> the offending facts were excised.

(Docket Entry # 121, pp. 6-7).  The Siciliano decision supports

this principle, albeit not its direct application to this case.[6]

The Siciliano court adhered to the independent source rule as

framed under Murray v. United States, 487 U.S. 533, 538 (1988),

and United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir.

2005), in the context of a search warrant containing information

acquired during the unlawful search.  The court engaged in a two

part inquiry consisting of the first prong of Murray and the

_____

[6]  Siciliano involved information obtained during a
protective sweep after the defendant invited two DEA agents into
his home to answer their questions.  Id. at 65.  The DEA agents
had information to suspect that the defendant was manufacturing a
controlled substance in his home.  Id. at 64-65.  One of the DEA
agents instructed four other law enforcement officers to enter
the apartment during which the group, including the DEA agent,
conducted a protective sweep.  Id. at 65.  The sweep included
opening a closed door to the defendant's bedroom and observing
gelatin capsules and entering an office where an officer observed
a plastic bag with white powder.  Id.  After this illegal search,
one of the officers prepared an affidavit to support a search
warrant that included the information regarding the gel capsules
and the powder observed during the illegal protective sweep.  Id.
at 66.

11

inquiry under <u>Franks v. Delaware</u>, 438 U.S. 154, 171-172 (1978).[7]

<u>See</u> <u>United States v. Dessesaure</u>, 429 F.3d at 365-367.  The two

part inquiry, paraphrased above by the defendant, is as follows:

> Where, as here, a search warrant is supported by an
> affidavit containing *unlawfully obtained information*, the
> independence of the search depends on two factors:  (1)
> whether the agents' decision to seek the warrant was
> prompted by what they had seen during their initial entry,
> and (2) whether the affidavit contained sufficient facts to
> support probable cause when the offending facts were
> excised.

<u>United States v. Siciliano</u>, 578 F.3d at 68 (quoting <u>United States</u>

<u>v. Dessesaure</u>, 429 F.3d at 367, with internal quotation marks and

citation omitted) (emphasis supplied).  The government bears the

---

[7]  Under the procedure "in <u>Franks</u>, a court faced with a
warrant affidavit which includes deliberately or reckless false
statements must set aside those false statements and determine
whether the remaining information in the affidavit sets forth
sufficient facts to support a finding of probable cause."  <u>United
States v. Dessesaure</u>, 429 F.3d 359, 365 (1ˢᵗ Cir. 2005) (citing
<u>Franks</u>, 438 U.S. at 171-72).  In the event a defendant makes a
preliminary showing, <u>Franks</u> entitles the defendant to an
evidentiary hearing.  If, at the hearing:

> "the allegation of perjury or reckless disregard is
> established by the defendant by a preponderance of the
> evidence, and, with the affidavit's false material set to
> one side [or the omitted material included], the affidavit's
> . . . content is insufficient to establish probable cause,
> the search warrant must be voided and the fruits of the
> search excluded to the same extent as if probable cause was
> lacking on the face of the affidavit."

<u>United States v. Rigaud</u>, 684 F.3d 169, 173 (1ˢᵗ Cir. 2012)
(quoting <u>Franks</u>, 438 U.S. at 156) (brackets in original).  Here,
the defendant does not cite to <u>Franks</u> or rely on a false or
reckless material statement or omission as a basis to cast doubt
on the admissibility of evidence under Local Rule 116.2(a) and
(b)(1) or <u>Brady</u>.  The affidavit disclosed the existence of the
proffer agreement.  (Docket Entry # 121-1, ¶ 4).

burden to establish "that the search was an independent source of the evidence." Id.

"The independent source doctrine acts as a limitation on the exclusionary rule of the Fourth Amendment." United States v. Dessesaure, 429 F.3d at 365. Under the doctrine, evidence is admissible when it "'has been discovered by means wholly independent of any constitutional violation.'" Id. (quoting Nix v. Williams, 467 U.S. 431, 443 (1984)).

Here, the defendant relies on a violation of the proffer agreement as the basis for finding that the affidavit supporting the March 2012 search contained unlawfully used information under Siciliano. (Docket Entry # 121, pp. 6-7). Use of evidence in violation of a proffer agreement, however, is not the same as use of evidence or information obtained during an unlawful protective sweep, see United States v. Siciliano, 578 F.3d at 65-66 & 68-69, or during an illegal pre-warrant entry into an apartment to "'freeze it,'" United States v. Dessesaure, 429 F.3d at 363.

In seeking to enforce a pre-indictment proffer agreement, "contract law principles serve as a useful reference." United States v. Santiago-Rodriguez, 993 F.Supp. 31, 35 (D.P.R. 1998); see United States v. McLaughlin, 957 F.2d 12, 16 n.4 (1st Cir. 1992) ("question here is simply the scope of any informal contractual agreement made between the parties and whether the government fairly lived up to its promises"); United States v.

Plummer, 941 F.2d 799, 802 (9th Cir. 1991) ("ordinary contract principles apply when interpreting informal immunity agreements") "As a contract, a proffer agreement must be enforced according to its terms.  It is the language of the contract that binds the parties."  United States v. Cobblah, 118 F.3d 549, 551 (7th Cir. 1997).  The proffer agreement bars the use of information "provided by" the defendant that is used "by the United States Attorney directly against" the defendant.  (Docket Entry # 121-1).

The purportedly "material" information the defendant seeks to support a motion to suppress consists of the communications between the government, Agin and individuals and entities working for Agin, such as Verdolino.  As modified, the time period for the communications is from February 1 to March 22, 2012.  The basis for the motion to suppress is the government's direct use of the information obtained from the defendant on May 15, 2009, under the proffer agreement to support the March 2012 affidavit and search warrant.

The communications during the February to March 2012 time frame, however, are not material to establish an independent source even assuming a violation of the proffer agreement provides a viable reason to suppress the material gathered under the warrant.  Rather, the communications are largely cumulative because of what the government already disclosed.  See Lavallee

v. Coplan, 374 F.3d 41, 46 (1st Cir. 2004) (agreeing with trial
judge and affirming, whether subject to direct review or habeas,
because the new material subject to Brady "was largely cumulative
of what the jury had already heard"); United States v. Prochilo,
629 F.3d at 268 (evidence is "'material' if there is a reasonable
probability that, had it been disclosed, the result of the
proceeding would have been different"); accord Strickler v.
Greene, 527 U.S. 263, 280 (1999); United States v. Celestin, 612
F.3d 14, 22 (1st Cir. 2010); United States v. Pesaturo, 519
F.Supp.2d 177, 189 (D.Mass. 2007) ("[m]ateriality for Brady
purposes is traditionally assessed from the vantage point of
appellate review, and focuses upon whether or not there is a
'reasonable probability that, had the evidence been disclosed to
the defense, the result of the proceeding would have been
different'").

     There is little, if any, indication that the communications,
if disclosed, will advance the defendant's argument that the
government violated the proffer agreement by using the forensic
images, electronic documents and other evidence gathered during
the May 15, 2009 search to obtain the March 2012 search warrant.
The affidavit by the Bankruptcy Analyst quoted above (Docket
Entry # 130-1) discloses the nature of the communications during
this time period.  The Bankruptcy Analyst avers that the United
States Attorney's Office requested access to review the computer

images and paper records on February 23, 2012.   Thereafter, from
March 15 to March 20, 2012, personnel in Akin's office "obtained
and provided to the U.S. Attorney's Office details regarding the
chronology of the delivery of computers and paper records" by the
defendant to Agin, "the possession of imaged copies and paper
records thereafter, and the current location and details[sic]
descriptions of the computer images and paper records."   (Docket
Entry # 130-1, ¶ 11).   The affidavit supporting the search
warrant also identifies the two individuals at Verdolino and that
they informed the government about two hard drives and the 29
boxes of records.

The defendant therefore has the information about the nature
and subject matter of the February 1 to March 22, 2012
communications.   The facts surrounding the gathering of
information to support the affidavit supporting the search
warrant are sufficiently disclosed to assess:   whether a
violation of the proffer occurred; whether the affidavit included
the purportedly "unlawfully" obtained information; and the
independence of the March 2012 search by application of the
independent source doctrine.   Finally, the affidavit in support
of the warrant identifies the two sources of the information that
prompted the Special Agent to seek the warrant, to wit, the May
2009 "consensual search" and Verdolino's index of the server and
partial inventory of the contents of the 29 boxes obtained from

the defendant.  (Docket Entry # 121-1, ¶ 17).  Hence, the
defendant's first argument does not provide a basis for
disclosure.

B.   Agin and His Agents as Government Agents

     The defendant also seeks disclosure on the basis that Agin
or his agents were acting as government agents when they retained
custody of the documents, including the electronically produced
documents, after the March 14, 2012 allowance of the motion to
dismiss.  According to the defendant, the retention of the
material and Agin's refusal to release "[the defendant's]
property to him" was an unlawful seizure without a warrant as of
March 14, 2012, in violation of the Fourth Amendment.[8]  (Docket
Entry # 121, pp. 8-9) (citing Jones v. United States, 132 S.Ct.
945, 949 (2012)).

     It is well settled that the Fourth Amendment does not apply
to private actors unless the party acted as an agent or
instrument of the government.  See United States v. Pervaz, 118
F.3d 1, 5 (1st Cir. 1997) (paraphrasing United States v.
Mendez-de Jesus, 85 F.3d 1, 2-3 (1st Cir. 1996), in
parenthetical).  As correctly indicated by the defendant, the

_____

     [8]  The argument thus assumes that the defendant has a
property right to the documents after the bankruptcy court
allowed the motion to dismiss and at the time of the March 22,
2012 seizure.  The government submits that the bankruptcy court
had the authority to retain the material until the April 3, 2012
closure of the case.

inquiry of whether an individual or entity acts as a government
agent is not subject to a specific test or standard.  See id. at
6 (noting that "any specific 'standard' or 'test' is likely to be
oversimplified or too general to be of help").  The inquiry
examines pertinent factors consisting of "the extent of the
government's role in instigating or participating in the search,
its intent and the degree of control it exercises over the search
and the private party, and the extent to which the private party
aims primarily to help the government or to serve its own
interests."  Id.

     Here again, the defendant has a description of the
communications that took place between the government on one hand
and Agin, individuals working for Agin and Verdolino on the other
hand during the February 1 to March 22, 2012 time period.  The
description allows the defendant to assess the government's role
in instigating or participating in the March 22, 2012 search and
seizure of the imaged copies and paper records.[9]  As disclosed by
the Bankruptcy Analyst, the United States Attorney's Office
initially requested access to the computer images and the paper
records.  After the March 14, 2012 emails, personnel at Agin's
office provided details about the chronology of the delivery of
the computers and the paper records to Agin.  They also informed

---

     [9]  The application sought permission to search the premises
and to seize the two hard drives and the 29 boxes of material.

the United States Attorney's Office that Agin had possession of
the "imaged copies and paper records." (Docket Entry # 130-1, ¶
11). The defendant also has the information that the imaged
copies consist of the forensic images and the potential
evidentiary images. (Docket Entry # 130-1, ¶ 4). On March 20,
2012, the two Verdolino employees informed the government that
the two hard drives containing the forensic images of the server
and the laptop computer as well as the 29 boxes of paper records
were located and maintained at Verdolino's Foxboro office. The
record therefore discloses a certain level of governmental
interaction and control over Agin and office personnel, including
Verdolino, with respect to the March 22, 2012 search. The record
also includes information about the nature of the assistance
provided by personnel in Agin's office to the government.

The defendant also knows that on May 18, 2010, personnel at
Agin's office informed that United States Attorney's Office that
the images and paper records revealed information about real
estate matters. On July 16, 2010, personnel at Agin's office
gave the United States Attorney's Office the aforementioned list
of files and the two page summary. (Docket Entry # 139-1, ¶¶ 8-
9). The search warrant was executed at Verdolino's office on
March 22, 2012.

Although the communications between February 1 and March 22,
2012 may further illuminate the relationship, they are not

material in the sense of casting doubt on the admissibility of
the seized material under the circumstances where, as here, the
record discloses to a degree the nature and content of those
communications. See Lavallee v. Coplan, 374 F.3d at 46.  If
disclosed, there is not a reasonable probability that the result
of the suppression motion would be different.  See United States
v. Prochilo, 629 F.3d at 268.

The statutory framework of the bankruptcy proceeding further
reduces the materiality or significance of the undisclosed
communications because it reduces the ability of the defendant to
succeed on the anticipated motion to suppress.  Agin and his
office have a statutory obligation, upon request, to assist the
United States Attorney in carrying out the prosecution of the
crimes charged in the Superceding Indictment.  28 U.S.C. §
586(a)(3)(F).  A Trustee such as Agin and members of his office,
however, ordinarily do not act as government agents.  See
generally In re Kloberdanz, 2011 WL 5854692, *6 (Bkrtcy.D.Colo.
Nov. 21, 2011) (property became part of bankruptcy estate under
11 U.S.C. § 541, property was not debtor's and "even if any of
the items were hers, the Trustee was not an agent of the
government, so no Fourth Amendment right is implicated"); Wells
v. United States, 98 B.R. 806, 810 (N.D.Ill. 1989) ("a trustee in
bankruptcy has long been held not to be an agent of the United
States").

In addition, 11 U.S.C. § 554(c) ("section 554"), which addresses abandonment of property of an estate, provides that property is abandoned "at the time of the closing of a case" as opposed to at the time a court allows a motion to dismiss. 11 U.S.C. § 554(c). The docket of the bankruptcy case shows that the case was closed on April 3, 2012. Furthermore, "property that is neither administered nor abandoned (including property not properly scheduled that was never administered) remains property of the estate." In re Furlong, 660 F.3d 81, 86 (1st Cir. 2011) (citing 11 U.S.C. § 554(d); see also Jeffrey v. Desmond, 70 F.3d 183, 186 & n.3 (1st Cir. 1995). Finally, although the March 14, 2012 email by Agin's counsel may indicate an intent to abandon the documents, there was no "notice" of abandonment under section 554(a). See 11 U.S.C. 554(a); see also In re Furlong, 660 F.3d 81, 88 (1st Cir. 2011).

CONCLUSION

In accordance with the foregoing discussion, the motion for discovery (Docket Entry # 120) is therefore **DENIED**.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge