UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 10-10264-RGS

UNITED STATES OF AMERICA

v.

MICHAEL DAVID SCOTT

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

April 14, 2014

STEARNS, D.J.

In February of 2009, defendant Michael David Scott was informed that he was the target of a federal investigation into alleged mortgage lending fraud.[1] On February 23, 2009, Scott and his then-counsel William Keefe were invited by the U.S. Attorney's Office in Boston to enter into a proffer agreement. The proffer agreement was a standard form use immunity agreement drafted by the government. *See Kastigar v. United States*, 406 U.S. 441 (1972). It stated, insofar as is relevant here,

> 1. No statements made or other information provided by Michael Scott, will be used by the United States Attorney directly against him, except for purposes of cross-examination and/or

---

[1] The Superseding Indictment charges Scott with recruiting straw buyers as purported purchasers of condominium buildings and with preparing false mortgage applications and closing documents to procure mortgage loan proceeds.

impeachment. . . .

> 2. The government may make derivative use of, or may pursue any investigative leads suggested by, any statements made or other information provided by Michael Scott in the course of the proffer. Any evidence directly or indirectly derived from the proffer may be used against him and others in any criminal case or other proceeding.

Three days later, Scott and Keefe met with government attorneys in a second proffer session. During that meeting, Scott agreed to permit government agents to access and copy the hard drives of his server and office computers, which he admitted contained records relevant to the government's investigation. After several subsequent meetings, Assistant U.S. Attorney (AUSA) Victor Wild emailed attorney Keefe on April 23, 2009, asking that Scott sign a consent-to-search form prior to the records being examined. On May 15, 2009, two FBI special agents and two government computer technicians met with Scott at his office. Scott was presented with, and signed, a FBI consent-to-search form authorizing the government to make forensic images of the storage drives on Scott's Compaq Presario desktop computer and his Dell PowerEdge server.[2] While the technicians imaged the computer and server, the FBI agents interviewed Scott further. Although Keefe had

---

[2] Although it appears that the government had initially intended to take physical possession of the computer equipment, it decided at some point prior to the May 15, 2009 meeting to instead image Scott's computer and server.

authorized the May 15th meeting with his client, he chose not to be present. In total, Scott met with representatives of the government eighteen times between February and December of 2009 and, during that period, provided the government with some 800 documents.[3]

As the government's criminal investigation continued, Scott filed a voluntary petition for bankruptcy on April 30, 2009. Pursuant to the bankruptcy proceeding, Scott met at various times in January of 2010 with the Trustee for the United States, the Trustee's counsel, and the Trustee's accounting firm, Verdolino & Lowey (V&L). Scott provided V&L with his Dell server, his IBM laptop computer, and 29 boxes of business records. V&L imaged the server and the computer and returned them to Scott.

In March of 2010, the Trustee alerted the FBI and U.S. Attorney's Office of his suspicion that Scott was attempting to perpetrate a bankruptcy fraud.[4]

-----

[3] Scott met with AUSAs Wild and Disantis, FBI Agents Galas, McCormick, and Ragosta, and/or Auditor Zappala on February 23, February 26, March 5, March 9, March 12, April 28, May 7, May 15, June 2, June 9, June 23, July 8, August 18, August 26, October 8, November 16, December 11, and December 18, 2009.

[4] U.S. trustees are appointed and supervised by the U.S. Attorney General. *See* 28 U.S.C. §§ 581(a), 586. Trustees have an affirmative duty to notify the U.S. Attorney's Office of "matters which relate to the occurrence of any action which may constitute a crime under the laws of the United States and, on the request of the United States attorney, assist[] the United States attorney in carrying out prosecutions based on such action." *Id.* at §

A few months later, the Office of the U.S. Trustee informed the U.S. Attorney's Office and the FBI of records of real estate transactions found in the V&L copied images that the Trustee believed indicative of potential mortgage fraud. In July of 2010, the Trustee's Office provided the U.S. Attorney's Office with a list of files found on the V&L copies of Scott's server and laptop drives, together with a two-page summary of V&L's "preliminary observations" about the contents of the files.

Some eighteen months later, on February 17, 2012, the Trustee advised AUSA Wild that he had tentatively agreed to dismiss Scott's bankruptcy case, which he believed would obligate him to return the computer images and paper documents to Scott. A week later, the U.S. Attorney's Office requested that the Trustee provide it with the V&L computer images and the 29 boxes of paper records. On March 14th, 2012, the Trustee dismissed Scott's bankruptcy petition. He then advised Assistant U.S. Attorney Wild that he was faced with conflicting legal obligations and requested that the government issue a subpoena for Scott's records. Between March 15 and March 20, 2012, the Trustee furnished the U.S. Attorney's Office with detailed descriptions of the computer and server images and the paper records.

---

586(a)(3)(F).

4

On March 21, 2012, an FBI Special Agent submitted an affidavit in support of a search warrant to seize the V&L imaged copies of Scott's server and laptop, as well as the paper records being held at V&L's office. The affidavit relied in large part on data obtained from the FBI's review of Scott's server that had been imaged at his office on May 15, 2009. A Magistrate Judge issued the warrant and the government executed it the following day.

Scott now moves to suppress the information that the government obtained directly from his desktop computer and server, as well as the material seized from V&L's office, on the grounds that the use of this evidence against him would contravene the terms of the proffer agreement and violate his rights under the Fifth Amendment. Scott also alleges that the Trustee's retention of the material after the dismissal of his bankruptcy petition constituted an unlawful governmental seizure. The government in opposition asserts that Scott, by signing the FBI consent-to-search form, waived the protections of the proffer agreement and, even if he did not, the inclusion of the data learned from the search in the application for the March 22, 2012 search warrant was a permitted "derivative use." With regard to Scott's Fourth Amendment claim, the government maintains that Scott had no expectation of privacy in the cloned files as they had been voluntarily produced to the Trustee, and that in any event, the Trustee was not acting as an agent of the prosecution.

**Consent-to-Search Form**

The government argues in the first instance that the FBI's consent-to-search form signed by Scott exempted the data obtained from his desktop computer and server from the proffer agreement's assurance that "[n]o statements made or other information provided by Michael Scott" would be used directly against him. This contention rests on the rote acknowledgment in the preprinted consent form that the signee is "giv[ing] permission for this search [] freely and voluntarily [] and not as the result of threats or promises of any kind." Because of Scott's abjuration of any "promise," the government argues that the subsequently executed consent form trumps the guarantees of the proffer agreement.

Proffer agreements, like plea bargains, are construed under contract-law principles and, as in the case of an ordinary contract, the language of the agreement defines the rights and obligations of the parties. *United States v. Melvin*, 730 F.3d 29, 37 (1st Cir. 2013). Where that language is subject to conflicting interpretations, it is the intent of the parties in forming the agreement that controls. *Affiliated FM Ins. Co. v. Constitution Reinsurance Corp.*, 416 Mass. 839, 845 (1994). There is, however, a significant caveat – "[u]nlike the normal commercial contract, it is due process that requires that the government adhere to the terms of any immunity agreement it makes." *Id.*

at 39, quoting *United States v. Pelletier*, 898 F.2d 297, 302 (2d Cir. 1990) (internal quotations and alterations omitted). As a result, a court's regard for a defendant's bargained-for protections is "glossed with a concern that the defendant's consent to appear at a proffer session should not become a lever that can be used to uproot his right to fundamental fairness under the Due Process Clause." *Id*. Moreover, given its overwhelming bargaining advantage, any ambiguity in the agreement is construed against the government. *Id*. at 37. Put simply, when executing its obligations under a proffer agreement, "the government must turn square corners . . . ." *Id*. at 38, quoting *Ferrara v. United States*, 456 F.3d 278, 280 (1st Cir. 2006).

In this case, the prosecution far from squaring the corners, lopped them off at their edges. The May 15, 2009 meeting at which the government imaged Scott's computers was the eighth of eighteen serial proffer sessions in which Scott participated. The government does not dispute that it never explained to Scott's attorney, nor did it warn Scott before he signed it, that the consent-to-search form was intended to operate as a waiver or modification of the proffer agreement. It strains credulity to believe that the government's position that the proffer agreement was amended by the consent-to-search form is anything but a creative after-the-fact invention. Nor would it be reasonable to suppose

that Scott, who at the time did not have counsel present,[5] would have understood that he was giving up the protections of the government's immunity offer. This is doubly so when considered in the light of Scott's (and his lawyer's) participation in ten subsequent proffer sessions. As Scott's new counsel concisely puts it, "[n]othing in the proffer agreement suggests that [ ] Scott's bargained-for safeguards would stand or fall depending on the manner in which he provided information to the government, much less that they could be utterly lost if he signed the wrong form." Def.'s Br. at 8.

The government's reliance on *United States v. Merz*, 2009 WL 1183771 (E.D. Pa. May 4, 2009), is misplaced. The *Merz* court permitted additional charges to be brought against a defendant based on information obtained from the government's assumption of the defendant's online identity on an internet message board, the permission for which the defendant had given during a proffer session pursuant to a signed consent form. In *Merz*, however, the government and the defendant agreed that the information gained from exploiting the defendant's identity constituted derivative evidence admissible under the proffer agreement. The issue before the *Merz* court was whether the

---

[5] While it was unwise for Scott's attorney to allow him to attend this eighth session without his being present, it strongly suggests that he, like Scott, was relying on the government's good faith in the matter.

defendant was entitled to *equitable* legal immunity, an issue that hinged on whether the government breached its duty of good faith in failing to honor a promise of leniency.[6]   *See id.* at 7.   The question here is not whether the government failed to pursue leniency for Scott, but whether the government effectively duped Scott into waiving the guarantee that evidence he provided would not be used *directly* against him.[7]

---

[6] "Although the concept of equitable immunity is not well defined, the underlying principle is that when [an inchoate] promise of immunity induces a defendant to cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled." *United States v. Fuzer*, 18 F.3d 517, 521 (7th Cir. 1994) (internal quotations, citations, and alterations omitted).

[7] The government also cites to *United States v. Miles*, 2012 WL 4178274 (S.D.N.Y. Sept. 20, 2012), apparently in support of the proposition that an oral consent agreement is enforceable. As an initial matter, it appears that the proffer agreement at issue in *Miles* did not place as rigid restrictions on the government as is the case here. In any event, the prosecutor in *Miles* did what could have been done in this case. After receiving an oral consent to a search from the defendant, the prosecutor in *Miles* immediately wrote to defendant's counsel informing him that

> by this email, I confirm that Mr. Miles provided oral consent during the proffer for law enforcement to search the cellphone recovered from him in connection with his arrest, and to review and seize any information therein. *Please be advised that*, pursuant to the proffer agreement, *any information recovered during this search may be used for any purpose, including against Mr. Miles in this or any other case. Please let me know immediately if Mr. Miles does not consent, in which case we will obtain a search warrant.*

The government's final claim is that whether the proffer agreement was rescinded or not does not matter because it could have obtained a warrant for the May 15, 2009 search without relying on Scott's signing of the consent form. Even were this true, the due process inquiry is "not concerned with what the government might have done but, rather, with what the government did." *Melvin*, 730 F.3d at 38. The government did not obtain a warrant for the electronic devices in Scott's possession, but instead "relied on its (mistaken) interpretation of the proffer agreement. Much as it might like to do so, it cannot reinvent that agreement now." *Id*. It follows that the information obtained from Scott's server and desktop computer as a result of the search conducted pursuant to the May 15, 2009 consent form may not be used directly against Scott at trial.

**Derivative Use**

The government's second argument is that the use of the information provided by Scott to support the application for the March 22, 2012 search warrant constituted a permissible "derivative use" under the terms of the proffer agreement. Essential to this argument is the meaning of the term "derivative," a linguistic investigation that begins and ends with the term's

---

*Id*. at 6 (emphasis added).

definition.   A thing derivative is "[s]omething derived; a thing flowing, proceeding, or originating from another."  *The New Shorter Oxford English Dictionary*, 641 (1993).  In this instance, the government relied on data from the server that Scott had provided to obtain a warrant to seize the *exact same data*.[8]  It is conceptually impossible for a thing to be derived from its identical self.  If the right to make derivative use of proffered evidence means that an offer of immunity can be overcome by simply making a copy of the thing proffered, a defendant is left bare of protection for anything but the verbatim use of his statements at trial,   thus rendering meaningless the protection extended in the agreement to "other information provided."[9]

The government tethers its derivative use argument to *United States v.*

---

[8]  *See* McCormick Aff. ¶ 17(a) ("Forensic review by the FBI of the server imaged pursuant to consensual search of Scott's server on May 15, 2009, revealed myriad records including correspondence, emails, charts and other matters constituting evidence of fraudulent real estate mortgage loans.  *The same server* was subsequently imaged pursuant to bankruptcy proceedings . . . ." (emphasis added)).

[9]  It is important to note that the question of whether (and at what level of attenuation) proffered *statements* concerning physical evidence might be used to support a search warrant seeking that evidence is not presented here.  In *United States v. Patane*, 542 U.S. 630 (2004) (*plurality opinion*), Justice Thomas, writing for a plurality of the Court, concluded that the Self-Incrimination Clause is not implicated by the introduction at trial of physical (derivative) evidence discovered as the result of a defendant's voluntary, but un-*Mirandized* statements.

*Johnson*, 1999 WL 378318 (E.D. La. June 10, 1999), a case in which a district court found that the inclusion of a defendant's proffer-protected statements in an affidavit supporting a search warrant to seize corporate records was deemed a proper derivative use. The *Johnson* court, it should be noted, held that "[p]lacement of the statements in the warrant affidavit was for the purpose of developing *other evidence* in the case . . . ." *Id*. at 4 (emphasis added). Here, the government did not seek to collect *other* evidence – it used the immunized information in its possession to obtain the exact same evidence. Again, because it did not do so, it is of no moment that the government might have lawfully obtained the data from the server in the possession of the Trustee. *See Melvin*, 701 F.3d at 38 ("[T]he existence of a parallel universe in which the government properly obtained its sought-after information does not render its misstep in this one any less violative of the defendant's due process rights. A constitutional end may not be reached by unconstitutional means.").

This brings me to the government's argument that what it may have lost under the Fifth Amendment, it can reclaim under the Fourth Amendment.[10] If

---

[10] This, of course, assumes that the affidavit filed by the government in support of the seizure of the records in V&L's possession would, if redacted of any information directly taken from Scott, would still demonstrate probable cause for the seizure of documents unrelated to Scott's proffer. *See Franks v. Delaware*, 438 U.S. 154, 171-172 (1978). *See also United States v. Galpin*, 720 F.3d 436, 449 (2d Cir. 2013) (the valid portions of the warrant must be

this were strictly a Fourth Amendment suppression case, the government would certainly be right. When Scott filed a petition for voluntary bankruptcy and turned over the required records of the estate to the Trustee, including the server and hard drives copied by V&L, he surrendered any reasonable expectation he might have had in their contents. "It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant may reveal that information to the authorities, and if that occurs, the Fourth Amendment does not prohibit the governmental use of that information." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). *See United States v. Miller*, 425 U.S. 435, 442-443 (1976) (bank account records). Scott points to no authority supporting his assertion that the Bankruptcy Code (assuming that it could trump the Fourth Amendment) bestows a guarantee of

---

meaningfully severable from the compromised portions – the court must, in other words, be able to excise the clauses "that fail the particularity or probable cause requirements in a manner that leaves behind a coherent, constitutionally compliant redacted warrant"). Where portions of a warrant are invalid for lack of probable cause or particularity, "the infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant . . . but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized — on plain view grounds, for example — during their execution)." *United States v. Fitzgerald*, 724 F.2d 633, 636-637 (8th Cir. 1983) (*en banc*). *See United States v. Veillette*, 778 F.2d 899, 903-904 (1st Cir. 1985) (after excising information obtained as a result of an illegal entry, sufficient probable cause remained to provide an independent basis for the issuance of the warrant).

privacy in voluntarily disclosed records. *Cf. United States v. Setser*, 568 F.3d 482, 491 (5th Cir. 2009) ("[A]fter a receiver validly takes possession of records and other property, becoming their lawful custodian, the original owner has lost any reasonable expectation that those records would remain private." (internal quotations and citation omitted)).

Why is it then that the information the government received from Scott during his proffer, even though barred from any direct use at trial because of the Fifth Amendment, cannot be used as the fruits of a lawful Fourth Amendment seizure? The answer lies in the core guarantees of the Amendments themselves. Unlike the Fifth Amendment exclusionary rule, which is universal and applies to any compelled statement or incriminating act, such as one given under an offer of immunity, the Fourth Amendment exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271 (1990). "Where 'the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted.'" *Arizona v. Evans*, 514 U.S. 1, 10-11 (1995), quoting *United States v. Janis*, 428 U.S. 433, 454 (1976). Because the Fifth Amendment enshrines a right that is personal to a defendant,

its exclusionary rule sweeps more broadly than does that of the Fourth Amendment and it does not admit of exceptions. It is true that Fifth Amendment does not in all circumstances forbid the government from exploiting derivative evidence discovered as the result of a Fifth Amendment violation. *See United States v. Patane*, 542 U.S. 630, 637 (2004) (*plurality opinion*) (physical evidence discovered as the result of a defendant's voluntary statements offered without *Miranda* warnings, distinguishing a defendant's testimonial communications offered against him at trial). Here, however, the government in a sense created its own dilemma by assuring Scott that it would not use against him at trial any statement that he gave *or any other information* that he provided. Having platted the corners, it was for the government to turn them squarely. It did not.[11]

---

[11]There is, I acknowledge, a division of opinion over the issue of the extent to which a use immunity agreement forbids the government from relying on a defendant's proffer in obtaining a search warrant for physical evidence. *Compare United States v. Nanni*, 59 F.3d 1425, 1431 (2d Cir. 1995) (the "direct use" of immunized testimony included "referring to it in an application for court authorization to obtain evidence against the witness"); *United States v. Pielago*, 135 F.3d 703, 716 (11th Cir. 1998) (Kravitch, J., dissenting in part) (direct use of proffered statements concerning the existence and location of inculpatory evidence does not include using the statements to obtain a warrant to seize that very evidence) *with United States v. Salemme*, 91 F. Supp. 2d 141, 344 (D. Mass. 1999), *rev'd in part on other grounds*, 225 F.3d 78 (1st Cir. 2000) (immunized information in an application for court authorization to obtain evidence "might be more properly characterized as 'indirect'"). It must be remembered, however, that here the immunity offer

ORDER

For the foregoing reasons, defendant's motion to suppress the cloned files imaged after the execution of the consent-to-search form by Scott is <u>ALLOWED</u>. The motion to suppress the cloned files seized pursuant to the search warrant of March 22, 2012, from V&L is also <u>ALLOWED</u>. The court takes no position on the admissibility of any other evidence seized pursuant to the March 22, 2012 warrant (assuming its validity).

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

extended to "other information" (like the computer drives) that Scott might provide.