## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                    )
UNITED STATES OF AMERICA,               )
                                                    )          Criminal Case No. 10-10264-RGS
              v.                                    )
                                                    )
MICHAEL DAVID SCOTT, et al             )
_____)

### DEFENDANT MICHAEL DAVID SCOTT'S SENTENCING MEMORANDUM

This is a difficult and heartbreaking case.  Prior to the instant offense, Michael David

Scott ("Mr. Scott") was a successful professional, a native of Trinidad and Tobago who came to

this country and worked his way through college and into a successful career, all the while

supporting his mother and other family members.  Mr. Scott had no criminal record and no prior

involvement with the criminal justice system before this investigation began in early 2009.  He

lived a happy, successful, and family-centered life.  He is deeply committed to his wife and, until

his incarceration, was heavily involved with raising his three children, whom he loves dearly.

There is no doubt that Mr. Scott was wrong to participate in the mortgage-fraud scheme

to which he has pleaded guilty.  He comes before the Court ashamed and remorseful for his

conduct.  Mr. Scott's guilty pleas reflect his recognition of the wrongfulness of his actions and

his acceptance of responsibility – an acceptance that Mr. Scott demonstrated since the very

inception of this investigation in early 2009 when he entered into and faithfully provided

voluminous amounts of information and documents pursuant to a proffer agreement with the

government.

Through his actions, Mr. Scott lost a successful career, fell into financial ruin, and faces

prolonged separation from his beloved family; Mr. Scott understands and accepts that reality.

But the period of separation recommended by the advisory Sentencing Guidelines goes far beyond what is necessary or just in this case.  For the following reasons, Mr. Scott requests that the Court consider the unique facts and circumstances of this case and impose a sentence within the range of 24 to 36 months.

## I.    HISTORY AND CHARACTERISTICS OF MR. SCOTT

Mr. Scott was born in 1965 to Norman Crawford and Amoy Scott in San Fernando, Trinidad (PSR ¶¶ 95, 98-99).  His parents raised him, along with his sister Carole and their children from prior relationships, in a strict but loving home (*id.* at ¶ 97).  Norman worked as a machine operator in a sugar refinery (*id.* at 98). He was the sole financial support for the family and passed away when Mr. Scott was nineteen years old (*id.*).

From the time of his father's passing, Mr. Scott took responsibility for financially supporting his mother and siblings (*id.*).  He first came to the United States in 1985 at the age of twenty, and obtained permanent residency the following year (*id.* at ¶ 95).  In 1991, Mr. Scott proudly became a U.S. citizen (*id.*). Two years after becoming a citizen, Mr. Scott began attending night classes at Suffolk University while working during the day as a bank teller (*id.* at ¶ 128).  After six long years of work, in 1999, Mr. Scott graduated with a Bachelor of Science degree in Business Administration with a concentration in Accounting and began a new career with Eaton Vance Mutual Funds (*id.* at ¶¶ 128, 136).  Shortly thereafter, Mr. Scott married his wife, Eunice, and they now have three children: a thirteen-year-old daughter and nine-year-old twins (*id.* at ¶¶ 111-115).

Until his incarceration, Mr. Scott was the sole financial support for his family (*id.* at ¶ 118).  In addition, Mr. Scott cared for his mother, whom he brought to the United States in 1988, and other family members, providing unconditional financial and emotional support and assisting

them with assimilating into American society.  *See id.*; *see also* Attachments K; N; and M. When

his mother had a stroke, Mr. Scott quit his job and survived on government assistance in order to

care for her. *See* PSR at ¶ 136.  Mr. Scott, his wife and their children are devoted members of the

First Baptist Church of Mansfield; in addition to attending services each Sunday, Mr. Scott

spearheaded several successful fundraising efforts for the church and also served as Treasurer

from 2003 until his incarceration in 2014. Attachments P and Q.

## II.    OFFENSE CONDUCT

In 2002, when Mr. Scott's first daughter was born, he began to look for a more flexible

work schedule that would provide sufficient financial support while allowing for more time with

his family.  It was at this time that Mr. Scott decided to try his hand at real estate. The real estate

market at that time offered tremendous promise, with mortgage rates at 40 year lows and the

housing market kicking into "high gear."[1] Boston, in particular, was a hotbed for housing, as

prices were consistently increasing every year between 1992 and 2002.[2] A Boston area

condominium purchased in 1993 sold at a median price of around $75,000, but by 2002 the

median selling price had more than tripled, approaching $250,000.

---

[1] The Financial Crisis Inquiry Commission, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (January 2011) available at <http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf>  (hereinafter "Inquiry Report"), page 84.

[2] The Boston Foundation & Citizens' Housing and Planning Association, *The Greater Boston Housing Report Card 2005-2006: An Assessment of Progress on Housing in the Greater Boston Area*, 40 Figure 4.4 (September 2006) available at <https://www.tbf.org/~/media/TBFOrg/Files/Reports/200506%20Housing%20Report%20Card.pdf> (hereinafter "Housing Report").

Number of Sales and Median Price of Single-Family Homes and Condominiums

Source: *Housing Report*, 40 Figure 4.4.

Because of this, real estate development was becoming a vocation for many people with little or no real estate experience or training, who were buying properties and flipping them shortly thereafter for substantial profits. *Inquiry Report*, 5-6

      Mr. Scott undertook his first real estate project in 2002 by purchasing a single building in Mattapan with a plan to convert the three apartments in the building into condominiums, renovate the units, and sell each for a profit. The renovations were performed by Mr. Scott's brother Walter, who was a general contractor. The project took months to complete as Mr. Scott worked on it in between his full-time job. Encouraged by this experience, Mr. Scott continued in the real estate market and soon made the leap into working full-time as a property developer. Mr. Scott's business model was simple – find an apartment building for sale, hire a lawyer to convert the building into condominiums, renovate the units, and then list them for individual sale.  Mr. Scott would also aid buyers seeking an income-producing property by offering management services, including collecting rents and finding new tenants if necessary.

As a novice in the real estate industry, Mr. Scott partnered with licensed real estate professionals while growing his property development business. He opened legitimate businesses, including Southeast Properties and M3 Realty, and employed licensed professionals to conduct his operations and manage the real estate.  In February 2006, Mr. Scott became a licensed real estate agent and in May of 2010, he received his real estate broker's license. *See* Attachment 1.

The conduct at issue in this case occurred between November 2006 and April 2008. During that time, Mr. Scott signed or had others at his direction sign false HUD-1 Settlement Statements in connection with the sale of forty-two condominiums located in 12 multi-unit buildings.  The majority of these transactions took place with Michael Anderson acting as the closing attorney and James Driscoll acting as the broker.  In the course of these transactions, Mr. Scott, Mr. Anderson, and Mr. Driscoll each played a separate and independent but necessary role in committing the crimes.

Mr. Scott was the property developer and seller of the condominiums to buyers. At or shortly after the closings, Mr. Scott or his designee would provide the funds needed to cover down payments or closing costs that were misrepresented as coming from the borrowers on the HUD-1 settlement statements.  The HUD-1 Settlement Statements were prepared by Attorney Michael Anderson and signed by Mr. Scott or his designee as seller.

Michael Anderson was a former Middlesex County Assistant District Attorney with a law practice in Stoneham, Massachusetts. As the closing attorney, Mr. Anderson acted as the lending institution's agent at the closings. His responsibilities included following the lender's closing instructions for the particular loan, preparing the HUD-1 settlement statements, and collecting and disbursing funds in accordance with the loan's terms. In closing the charged transactions,

Mr. Anderson prepared the fraudulent HUD-1 statements and failed to collect the necessary funds from the borrower, instead either collecting those funds from Mr. Scott directly or disbursing the funds owed to Mr. Scott less the down payment or other costs that were supposed to come from the borrower.

James Driscoll was a mortgage broker who worked at Gateway Funding and later Salem Five Cents Bank. As the mortgage broker, Mr. Driscoll originated the loans by taking the borrower's qualifying information, filling out a Uniform Residential Loan Application, determining a mortgage product for that particular borrower, ordering an appraisal for the property, and submitting the loan to underwriting.  Mr. Driscoll was also responsible for ensuring that Mr. Anderson acted as the closing attorney for the lending institutions.[3]

### III.    GUIDELINE CALCULATION

The Probation Office, in the Pre-Sentence Report ("PSR"), calculated a total offense level of 35, which corresponds to a Guidelines Sentencing Range of 168-210 months.  The PSR used a base offense level of 7 and applied a 20-level increase due to a loss greater than $7 million. PSR at ¶ 70-72.  Three two-level enhancements were added for the following specific offense characteristics: (1) the offense involved ten or more victims, PSR at ¶ 73, (2) the offense involved sophisticated means, PSR at ¶ 74, and (3) the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, PSR at ¶ 75. A four-level increase was added for an aggravating role in the offense. PSR at ¶ 77. Finally, a two-level decrease was subtracted for Mr. Scott's acceptance of responsibility. PSR at ¶ 81.

For the reasons that follow, Mr. Scott maintains that the guidelines range as calculated is in error, and vastly overstates what is required in his case to achieve the legitimate objectives of sentencing under 18 U.S.C. § 3553(a).

---

[3] The government did not bring criminal charges against Mr. Driscoll.  *See* PSR at ¶ 12, n. 3.

### A.      Loss Calculation

The calculated loss in the PSR fails to reflect certain credits and exclusions that the Guidelines require to be subtracted from the loss. *See* PSR at 49-50. The calculated loss amount in the PSR ignores available information[4] regarding these credits and exclusions and instead subtracts only the resale deed price from the original loan amount.  This results in an overstated loss calculation of $11,507,162[5] and a corresponding offense level increase of twenty levels. PSR at ¶¶ 70; 72; pp. 49-53. Specifically, the PSR's loss calculation: (1) fails to exclude interest[6] and finance[7] charges from the loss amount; (2) fails to take into account evidence of principal repayments; and (3) selects a means of valuing the amount received from disposition of the properties at issue that passes over the public auction sale amount and instead uses a later (and lesser) sale amount.

In addition to these methodological flaws, the PSR's loss calculation includes losses attributable to ten uncharged real estate transactions that should not have been counted as relevant conduct because the government failed to satisfy the Guidelines' preponderance of the evidence standard.  Mr. Scott contends that the loss calculation should include only the charged

---

[4] Mr. Scott submitted an appendix with his Objections to the PSR that included supporting documentation for his loss calculation. References to the PSR in this memorandum are meant to incorporate the supporting documentation cited in the Objections. For example, Tabs 1-46 contain the HUD-1 Settlement Statements in the order corresponding to the count in the Indictment and Tabs 47-56 correspond to the HUD-1 Settlement Statements for the nine relevant conduct transactions included in the calculation in alphabetical order.

[5] Mr. Scott's spreadsheets calculating the loss are attached as follows: (A) total loss; (B) principal repayment credits; (C) Interest charges exclusion; (D) finance charges exclusion; (E) credit for disposition of collateral; and (F) loss for relevant conduct transactions.

[6][6] Interest charges were highlighted in yellow on Tabs 1-56.

[7] Finance charges were highlighted in pink on Tabs 1-56.

transactions – as adjusted by various credits – as well as the loss for nine relevant conduct

transactions that are supported by the evidence, as set forth in the following chart:[8]

| | | | |
|---|---|---|---|
| 320 Warren Street, Unit 3 | 365 Centre Street, Unit 2 | 7 Parkman Street, Unit 1L | 7 Parkman Street, Unit 2L |
| 78-80 Granger Street, Unit 1 | 365 Centre Street, Unit 3 | 672 Adams Street, Unit 1 | 7 Parkman Street, Unit 2R |
| 78-80 Granger Street, Unit 2 | 81 Spencer Street, Unit 1 | 672 Adams Street, Unit 2 | 7 Parkman Street, Unit 3L |
| 78-80 Granger Street, Unit 2 | 81 Spencer Street, Unit 2 | 672 Adams Street, Unit 3 | 7 Parkman Street, Unit 3R |
| 78-80 Granger Street, Unit 3 | 81 Spencer Street, Unit 3 | 101 Hancock Street, Unit 1 | 546 Ashmont Street, Unit 2 |
| 22 Elmore Street, Unit 1 | 101 Hancock Street, Unit 2 | 101 Hancock Street, Unit 3 | 34 Avondale Street, Unit 1 |
| 22 Elmore Street, Unit 1 | 10 Navillus Terrace, Unit 1 | 10 Navillus Terrace, Unit 2 | 139 Bowdoin Street, Unit 3 |
| 22 Elmore Street, Unit 2 | 5 Parkman Street, Unit 1L | 10 Navillus Terrace, Unit 3 | 1 Greenmount Street, Unit 2 |
| 22 Elmore Street, Unit 2 | 5 Parkman Street, Unit 1R | 5 Parkman Street, Unit 2R | 133 Harold Street, Unit 3 |
| 22 Elmore Street, Unit 3 | 5 Parkman Street, Unit 2L | 5 Parkman Street, Unit 3L | 15 Lafield Street, Unit 1 |
| 22 Elmore Street, Unit 3 | 5 Parkman Street, Unit 3R | 3 Parkman Street, Unit 1L | 14 Lyndhurst Street, Unit 3F |
| 12 Lyndhurst Street, Unit 2F | 3 Parkman Street, Unit 2L | 3 Parkman Street, Unit 1R | 7 Treadway Road, Unit 1 |
| 12 Lyndhurst Street, Unit 2R | 3 Parkman Street, Unit 3L | 3 Parkman Street, Unit 2R | 286 Walnut Avenue, Unit 1 |
| 365 Centre Street, Unit 1 | 3 Parkman Street, Unit 3R | 7 Parkman Street, Unit 1R | 286 Walnut Avenue, Unit 2 |

1. Loss Calculation Methodology

The First Circuit has held that, at a minimum, loss must be calculated by subtracting the

amount received from the disposition of the collateral from the loan amount less any principal

repayments. *United States v. Appolon*, 695 F.3d 44, 67 (1st Cir. 2012). The guidelines mandate

that certain additional amounts be excluded from the loss amount as well, including interest and

finance charges. *See* USSG §2B1.1, comment (n.3(D)(i)) ("Loss shall not include . . . [i]nterest

of any kind, finance charges . . . or other similar costs."); *see also Ingle v. United States*, 2011

---

[8] Relevant conduct transactions are indicated by a double border outline.

WL 2183428, *3 (N.D. Tex. June 6, 2011).  (district court found, and government conceded, that loss in mortgage fraud case should not have included interest and loan charges).Moreover, when a case involves pledged collateral, the guidelines direct that the loss must be reduced by the amount recovered from the collateral's disposition. USSG §2B1.1, comment. (n.2(E)(ii)).

### a.  Principal Repayments

Evidence of principal repayments are available for twenty three of the charged loans, totaling $62,509.72.[9] *Id*. Principal repayments were calculated through two means. First, Salem Five was the only lending institution that provided an accounting of the loss for its loans. *See* Attachments G and H.  This accounting listed the principal remaining on each loan at issue. Defense counsel subtracted the remaining principal from the original loan amount to arrive at the amount of principal repaid for that particular loan.  *See* Attachments B (counts 33-46).  For an additional nine of the charged loans, defense counsel was able to locate the loan's amortization schedule through discovery provided by the government.  *See* Attachment B (Counts 2; 5; 7; 11; 13; 17; 18; 20; and 29).  This information showed the amount of principal paid down with each mortgage payment.  Defense counsel then calculated the number of payments made towards the loan by examining the number of months between the date of the quitclaim deed or the initial public notice of the foreclosure auction minus the 90 days provided by Massachusetts law for the borrower to cancel the foreclosure by repaying the amount due.  *Id*.  As a result, a reasonable approximation of the loss should exclude $62,509.72 as principal repayments. *Appolon*, 695 F.3d at 67; *see also* USSG §2B1.1, comment. (3(E)(i)).

### b.  Interest Charges

---

[9] This calculation is detailed at Attachment B. Also, since Mr. Scott's PSR objections were submitted, defense counsel located an additional spreadsheet provided by Salem Five that revealed the principal repaid for two additional loans; this information was not included in the information provided to the Probation Office.

The Guidelines direct that interest charges be excluded from the loss amount. USSG §2B1.1, comment (n.3(D)(i)). Interest charges included with the loans include: (1) Loan Discount (Line 802), representing the amount of prepaid interest on the loan; and (2) Interest (Line 901), representing the daily interest charges collected for the loan between the date of the settlement and the first day of the next month. The interest charges imposed in a loan are itemized on the HUD-1 Settlement Statements.  Adding the two types of interest paid in connection with the charged loans, as listed on the HUD-1s, the total interest for the charged transactions equals $192,306.79. *See* Attachment C.  As a result, the loss should exclude $192,306.79 in interest from the loss amount.

c.    <u>Finance Charges</u>

The Guidelines direct that finance charges be excluded from the loss amount. USSG §2B1.1, comment (n.3(D)(i)). Finance charges are "the cost of consumer credit as a dollar amount…includ[ing] any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4.  Various types of finance charges were imposed in the charged loans, including:

- Loan Origination Fee: the lender's and mortgage broker's fee for getting the borrower the loan;
- Appraisal Fee: fee for the lender to obtain an appraisal of the property;
- Credit Report Fee: fee for the lender to obtain the borrower's credit report;
- Credit Report Viewing Fee: fee for the lender to review the borrower's credit report;
- Commitment Fee: fee charged by the lender to keep a line of credit open for the borrower;
- Underwriting/Processing Fee: fee charged by the lender for costs associated with underwriting and processing the loan;
- Tax and Flood Certification Fees: fees charged by the lender to obtain service provider information on real estate property taxes and whether the property is in a flood zone;
- Miscellaneous: some lenders imposed additional fees or refer to discrete origination, underwriting, and processing fees more specifically or through differing terminologies,

including: document preparation fees, loan application fees, administrative fees, and lender loan charges;

- Attorney's Fees: fees for the attorney to draw up the paperwork and conduct the closing on behalf of the lender; and
- Courier Fees: the fees imposed for the delivery of documents relating to the loan.

The HUD-1 Settlement Statement itemizes each finance charge for that particular loan.

A calculation of these finance charges for the charged transactions totals $189,861.56.

Attachment D. Thus, this amount should be excluded from the loss.

d.    <u>Disposition of Collateral</u>

The Guidelines direct that the loss amount be reduced by the amount received from the disposition of the collateral. USSG §2B1.1, comment. (n.3(E)(ii)). The disposition of the collateral occurs when the property pledged as security for the loan is transferred to another's care or possession. *See Black's Law Dictionary* 238 & 422 (9th ed. 2010) (defining collateral and disposition).

The charged properties were disposed of in two ways: (1) a quitclaim deed, where the borrower's interest in the property was transferred to another individual for an agreed upon price; and (2) a foreclosure deed, where the interest in the property was transferred to the highest bidder at a public auction. For the properties sold at public auction, the PSR calculation skips over the collateral's disposition at public auction and instead selects the value from a subsequent re-sale.

The proper value of the disposition of collateral for a property that is disposed of through a public foreclosure auction is the highest bid paid. Under Massachusetts law the amount paid at the public auction sets that property's value at the time of sale. *Rodriguez v. First Union Nat. Bank*, 61 Mass. App. Ct. 438, 442, 810 N.E.2d 1282, 1286 (2004). Even if the highest bid was made by the mortgagee, that does not alter the fact that a "disposition" occurred because a public

11

auction is not simply a paper transaction. *Id*. The highest bidder receives ownership of the property by virtue of its bid; regardless of the bidder's identity, the highest bidder is obligated to pay the bid amount to the mortgage holder. *See In re Miller*, 459 B.R. 657, 673 (B.A.P. 6th Cir. 2011) *aff'd*, 513 F. App'x 566 (6th Cir. 2013) ("if a mortgagee bids more than the value of the property purchased, it, *like any other purchaser* at a mortgage foreclosure sale, *is required to pay, or credit the mortgagor, the entire amount of the bid*" (emphasis added)). Moreover, when a lender wins at public auction with the highest bid, it is precluded from arguing that the property is worth less than the amount the lender paid at public auction. *Freedom Mortgage Corp. v. Burnham Mortgage Inc.*, 569 F.3d 667, 672 (7th Cir. 2009) (Easterbrook, C.J.) (finding the lender is bound to the value of the property as set by its winning bid at public auction in a civil RICO case involving mortgage fraud).

The First Circuit does not appear to have addressed the issue of using public foreclosure auction values versus subsequent resale values in calculating loss under §2B1.1. The Second Circuit, however, has reviewed a victim restitution award to HUD as a result of false statements made to lending institutions in connection with mortgages where HUD resold the loans for nominal values ($1 to $120,000). *United States v. Boccagna*, 450 F.3d 107, 108-10 (2d Cir. 2006). In that case, the defendant made false statements to lending institutions in mortgages guaranteed by HUD, a position which led HUD to acquire the foreclosed properties. *Id*. The government conceded that calculating out of pocket losses based on HUD's nominal resale values would overstate the loss and, rather than apply the $20.6 million loss, proposed a loss of approximately $3.3 million. *Id*. at 111. For restitution purposes, however, the government argued that the proper amount was around $18 million (HUD's out of pocket expenses minus the amount expected to be acquired from resale of all the foreclosed properties). *Id*. The Second

Circuit disagreed and held that a district court abuses its discretion in using the nominal resale price for collateral to calculate the offset value for restitution purposes because such a calculation necessarily exceeds the amount required to make the victim whole. *Id*. at 117. The court recognized that crediting the mere nominal resale price effectively awards the victim with both a full recoupment payment and the fair market value of the collateral. *Id*. The Second Circuit noted that when an entity takes title to foreclosed properties it has the ability to defray its loss by whatever dollar amount the highest bidder would have paid for those properties in an arm's-length market transaction conducted contemporaneously to the transfer, and the entity's decision to sell the properties for a lesser amount later cannot thereby reduce the properties' value. *Id*. at 118-19.

In contrast, the Seventh Circuit rejected a mortgage fraud defendant's argument that loss should be measured by the difference between the loan amount and the lender's highest bid at a public foreclosure auction. *United States v. Green*, 648 F.3d 569, 584 (2011). The Court, however, relied on Bankruptcy Code statutory interpretation cases in the context of bankruptcy auctions where the creditor is *prohibited* from making a credit bid. *Id*. (citing *River Road Hotel Partners, LLC v. Amalgated Bank*, 651 F.3d 642, 650-51 (7th Cir. 2011) (noting that the speed and lack of notice in bankruptcy auctions require credit bidding to protect a sale that undervalues the asset); *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 320-21 (3d Cir. 2010) (creditors' right to credit bidding protects the valuation of the asset). Indeed, Judge O'Toole in the *Appolon* case recognized the difficulty of calculating loss in a manner representative of the defendant's culpability and utilized a similar foreclosure deed valuation in the loss calculation in that case, which reduced the ultimate loss by approximately $3.5 million less than that calculated in the

PSR. *See* Appellee Br., *United States v. Appolon* (1st Cir. Nos. 10-2243, 10-2266, 10-2313, 10-2350, 11-1130)   2011 WL 4735003, at *61-62 (Oct. 3, 2011).

Using bankruptcy precedent in criminal cases is comparing apples and oranges, because bankruptcy provisions are concerned with equitably disbursing proceeds amongst creditors, whereas the loss table is intended to serve as a proxy for culpability. Simply put, lenders are savvy creditors.  A lender knows it will be held to its bid amount and as a result may make the economic decision to accept the collateral in lieu of the entire amount owed; alternatively, if the lender believes that the collateral's value does not cover the loss, it may bid less than the full amount and seek a judgment for the remainder from the borrower. In any event, the winning bid at auction is the best barometer of the value of the property; if the lender's loss from the loan exceeds that of the collateral, the lender will bid less than the full amount, but if the lender believes that the collateral is sufficient to cover their loss then it will bid the full amount in order to secure its ownership.

Actual loss is limited to the pecuniary harm reasonably foreseeable as a result of the offense.  Calculating loss based on subsequent sales, which in some cases occurred years after the foreclosure, opens the door to intervening factors. After a foreclosure auction, the property becomes owned by the bank.  Decisions regarding subsequent sales are necessarily infected with extrinsic considerations, such as corporate earnings reports, the need to protect the value of other corporate assets, and minimizing tax liability. Gateway Funding or Salem Five may very well want to maximize tax write offs in a particular year by selling property at a loss, and that may be a legitimate consideration for managing their real estate portfolio.  It is not, however, an appropriate consideration when punishing an individual. *See Robers v. United States*, 134 S. Ct.

1854, 1859 (2014) (noting that the causal chain linking the defendant to the loss may be broken by subsequent actions by the victim).

When using the public auction sale amount, the amount to be credited against the loss for the charged transactions yields a credit of $4,755,838.42.  *See* Attachment E. This amount equates to an average disposition value for the 42 charged properties of $113,234.24, whereas the PSR's calculation would value each condominium at $66,327.[10]

e.      Revised Loss Calculation

The loss, calculated with the above methodology, for the charged transactions is as follows:

| | |
|---|---|
| Loan Value | $10,189,465 |
| (-) Principal Repayments | $62,509.72 |
| (-) Interest Charges | $192,306.79 |
| (-) Finance Charges | $189,861.56 |
| (-) Resale Value | $4,755,838.42 |
| **LOSS** | $4,988,948.51 |

2.      Loss Purportedly Attributable to Relevant Conduct

The PSR also includes nineteen transactions as relevant conduct in calculating the Guidelines Range. *See* PSR at 67-71 (properties highlighted in blue on "Schedule of Relevant Conduct Transactions").

To count uncharged transactions as relevant conduct, the government must prove by a preponderance of the evidence a sufficient nexus between the conduct underlying the other transactions and the offense of conviction. *United States v. Reyes*, 3 F.3d 29, 31 (1st Cir. 1993). Each disputed transaction must be directly relevant to the offense of conviction and disputed

---

[10] The median selling price for a Dorchester condominium was $145,000 in 2009 and $190,000 in 2010.  *See* Dep't of Neighborhood Development, *Real Estate Trends 2010*, 6, available at <http://www.cityofboston.gov/Images_Documents/RealEstateTrends_2010_tcm3-24316.pdf >.

transactions cannot be bootstrapped into the Guidelines calculation by virtue of their similarity to other relevant conduct. *United States v. Bollock*, 454 F.3d 637, 642 (7th Cir. 2006). Seven Courts of Appeal have found that to be "relevant conduct" the other conduct must be criminal. *United States v. Griffith*, 548 F.3d 1004, 1013 (10th Cir. 2009) (collecting cases). The mere fact Mr. Scott may have derived monetary gain from real estate transactions or that real estate transactions bore some similarity to the charged transactions is insufficient to make them relevant conduct. Instead, the government must prove each real estate transaction was criminal and that the particular criminal transaction bears a sufficient nexus to the charged transactions.

A conclusory assertion that Mr. Scott commits fraud in real estate transactions is not a sufficient basis for a finding that any particular real estate transaction is relevant conduct. *See United States v. Mullins*, 971 F.2d 1138, 1145 (4th Cir. 1992) ("To state that the pattern [of defendant's] conduct was that of assisting his brother in committing various frauds when asked to do so…is to describe his conduct at such a level of generality as to eviscerate the evaluation of whether uncharged criminal activity is part of the 'same course of conduct or common scheme or plan' as the offense of conviction. With a brushstroke that broad, almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct.").

In this case, out of the nineteen transactions determined to be relevant conduct in the PSR, ten cannot be considered relevant conduct, because the government failed to meet its burden of proof.[11]

a.        Use of Proffer Information

---

[11] The Probation Office disagreed with Mr. Scott's objection to the inclusion of these transactions based on reassurances from the government that evidence exists to support the finding. *See* PSR at 52.  Defense counsel, however, has reviewed the discovery and is unable to find any such proof, and the government has confirmed that defense counsel has been given all discovery in the government's possession. *See Response* (dkt #404) at 2.

16

Pursuant to the proffer agreement entered into between the government and Mr. Scott, the government agreed not to use the information provided by Mr. Scott in his 19 proffer sessions directly against him in a criminal proceeding. The government has failed to abide by the terms of this proffer agreement (again) by including five properties that necessarily rely on Mr. Scott's proffer to prove that these transactions shared a nexus with the charged offenses for relevant conduct purposes.  The properties include: (1) 2 Elton Street, Unit 1; (2) 19 Everton Street, Unit 2; (3) 286 Walnut Avenue, Unit 3; (4) 7 Rowell Street, Unit 1; and (5) 7 Rowell Street, Unit 3. The only evidence of any misconduct for any of these five transactions comes from Mr. Scott's proffer sessions.  For all four properties except 19 Everton, Unit 2**,** the buyers were not interviewed and there is no evidence of what happened.  For 19 Everton, Unit 2, the only available interview memoranda show that there was no fraudulent activity.  And for both Rowell Street transactions and 2 Elton Street, there are simply no documents memorializing the transactions.  In sum, where no evidence other than the proffered information exists, the government has failed in its burden of proof.

> b.    Other Failures of Proof

Despite the fact that the offense conduct at issue in this case involves providing down payments and closing costs, the PSR includes as relevant conduct 139 Bowdoin Street, Unit 3, a transaction where the borrower received more than 100% financing and the loan did not require a down payment or closing costs.  *See* Attachment 56.  Also included are 86 George Street, Unit 2 and 15 Lafield Street, Unit 2, which were transactions where the borrower was never interviewed.  The government has produced no evidence to defense counsel or probation that any misrepresentations were made to a lender so as to transform these real estate transactions into criminal activities. In two other transactions, 1412 Blue Hill Avenue, Unit 2 and 86 George

Street, Unit 1, the government's memoranda of interviews with the buyers do not reflect any evidence to support a finding that Mr. Scott provided a down payment or closing costs for those transactions. In short, the government fails to offer evidence demonstrating that these transactions were criminal, that Mr. Scott engaged in criminal activity during these transactions, or that the transactions bear a nexus to the charged transactions.

In total, the government has submitted a spreadsheet of 130 transactions it seeks to include in the Guidelines loss calculation to increase Mr. Scott's sentence. The government's "evidence" for these transactions is a conclusory assertion that they bear "indicia of fraud" by virtue of innocuous facts such as the fact that Mr. Scott's wife purchased the building or the building was purchased by Mr. Scott and individual units were then resold. More than half of the 19 transactions the PSR determined were relevant conduct fail to meet the government's burden of proof.  Accordingly, the guideline calculation should not include those transactions. *See United States v. Taylor*, 277 F.3d 721, 726 (5th Cir. 2001) (vacating the sentence because the district court erred in including PSR allegations of relevant conduct where the government failed to submit substantiating support, the PSR was already on shaky grounds, and the PSR's bald assertion that the evidence supporting the allegations did not come the defendant's immunized plea agreement were not enough to sustain the government's burden).

The loss for relevant conduct, Attachment F, is as follows:

| Property | Loan | Amount from Disposition of Collateral | Fees & Interest | Loss |
|---|---|---|---|---|
| 546 Ashmont Street, Unit 2 | $346,500 | $318,441 | $7,932.27 | $20,126.73 |
| 34 Avondale Street, Unit 1 | $361,000 | $210,000 | $10,003.66 | $140,996.34 |
| 1 Greenmount Street, Unit 2 | $337,500 | $60,000 | $10,679.27 | $266,820.73 |
| 133 Harold Street, Unit 3 | $329,650 | $343,365 | $10,125.30 | $0.00 |
| 15 Lafield Street, Unit 1 | $337,500 | $190,000 | $4,864.90 | $142,635.10 |
| 14 Lyndhurst Street, Unit 3F | $237,500 | n/a | | n/a |

| | | | |
|---|---|---|---|
| 7 Treadway Road, Unit 1 | $380,000 | $342,304 | $8,756.72 | $28,939.28 |
| 286 Walnut Avenue, Unit 1 | $365,750 | $352,209 | $16,327.58 | $0.00 |
| 286 Walnut Avenue, Unit 2 | $365,750 | $100 | $9,772.18 | $355,877.82 |
| | $3,061,150 | $1,816,419 | $78,461.88 | |
| | | | **TOTAL:** | **$955,396.00** |

The total loss calculation, using the above methodology, is as follows:

| | |
|---|---|
| Loans' Value | $10,189,465 |
| (-) Principal Repayments | $60,685.72 |
| (-) Interest Charges | $192,306.79 |
| (-) Finance Charges | $189,861.56 |
| (-) Disposition of Collateral | $4,755,838.42 |
| **LOSS** | $4,990,772.51 |
| Relevant Conduct Loss: | $955,396.00 |
| **TOTAL LOSS** | **$5,946,168.51** |

Because the loss is greater than $2.5 million, but less than $7 million, the loss calculation

enhancement should be reduced by two levels.

### B.      Number of Victims

The Guidelines impose a two-level enhancement for an offense involving ten or more

victims. USSG §2B1.1(b)(2)(A)(i). A "victim" is someone who "sustained any part of the actual

loss" as determined by the Guidelines' loss calculation.  USSG §2B1.1, comment. (n.1).  The

government has failed to demonstrate that ten entities suffered a part of the actual loss, thus the

enhancement does not apply. *Id*.; *see also United States v. Miller*, 588 F.3d 560, 567-68 (8th Cir.

2009) (affirming the district court's decision not to apply a number of victim enhancements

because the government failed to prove any victim was encompassed within the actual loss).

According to the PSR, the ten victims in this case "are the mortgage lenders involved in

the charged conduct who made loans based on fictitious application information."  *See* PSR ¶ 58.

The lender that issued the bulk of the mortgages at issue in this case was Gateway Funding. Some of the loans were issued by Gateway Funding directly, and others were brokered by Gateway Funding on behalf of other mortgage lenders. The PSR counts Gateway Funding as the victim for the loans it issued on its own behalf, and counts the other mortgage lenders as victims for the loans Gateway Funding brokered.

According to a Boston Globe article submitted to the Probation Office by the government, Gateway Funding bought back at least $7 million dollars in loans that it had issued on behalf of other lenders. Mr. Scott sought discovery on precisely which loans Gateway Funding bought back from other lenders because, if the loans that Gateway bought back were loans at issue in this case, that would mean that at least some of the other "victims" in this case were not in fact victims that could be counted under §2B1.1(b)(2)(A)(i). In response, the government informed Mr. Scott that it has no additional information about these loan buybacks other than has already been provided. The only lender that provided evidence or a statement of loss to the Probation Office was Salem Five – a completely separate lender unrelated to the Gateway loans. In other words, the government cannot prove that the loans at issue in this case were <u>not</u> bought by Gateway prior to suffering any pecuniary harm. Because the government cannot prove that ten distinct entities suffered a pecuniary harm, the enhancement for number of victims should not apply.

### C.   Sophisticated Means

The PSR incorrectly applies a two-level "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10)(C). An offense involves "sophisticated means" where the conduct is "especially complex or especially intricate" *See* U.S.S.G. §2B1.1, comment. (n. 8(B)). Examples of such conduct include: dividing up a fraudulent operation into multiple jurisdictions to avoid

detection, using corporate shells, creating fictitious entities, and hiding assets in offshore financial accounts. *See id.*

There is no evidence that Mr. Scott engaged in this type of conduct during the commission of the offense. Nor is the alleged scheme itself sophisticated. While every fraud offense encompasses a misrepresentation or falsehood, not all rise to the level of sophistication. *See United States v. Hulse* 989 F.Supp.2d 1224 (M.D. Ala. 2013) (holding that defendant convicted of interstate distribution of property involving fraudulent documents and use of funds for a fraudulent purpose did not use sophisticated means because the scheme was straightforward and its crux was that the defendants "lied to obtain money and then lied about the use of the money").

The government alleges that Mr. Scott and others "prepared and submitted fraudulent loan applications and HUD-1 Settlement Statements which included numerous misrepresentations" in order to "facilitate and conceal their fraudulent activities." PSR at ¶ 74. There is nothing in the record to suggest that Mr. Scott or others employed a high degree of complexity in their efforts to conceal their actions. To the contrary, Mr. Scott's condominium conversion efforts were publicized in the Boston Globe as far back as 2005. *See* Gail Ravgiala *Triple-deckers get a Second Life,* Boston Globe, Apr. 24, 2005. The scheme employed by Mr. Scott and others is a typical mortgage fraud scheme lacking any of the characteristics defined by the guidelines as "sophisticated." Moreover, the loans at issue in the vast majority of the transactions at issue were so-called "liar loans." When a bank declares that it will not verify the information provided to it, there is no need to resort to sophisticated means to carry out a fraud.

The means employed by Mr. Scott and others were also not nearly as complex as other mortgage fraud schemes in the district. Unlike the scheme perpetrated in *United States v. Foley*

783 F.3d 7, 26 (1st Cir. 2015), Mr. Scott did not instruct anyone to prepare nor did he personally engage in the creation of fake checks and other false documentation to create a fake paper trail for the down payments at issue. *See id.* at 25. Similarly, the recruitment and use of out of state buyers does not arise to the level of complex or intricate conduct. *See* U.S.S.G. §2B1.1(b)(10). This was not a national scheme perpetrated across the country, but three individuals residing in Massachusetts and Virginia telling friends and family about a business opportunity.  Contrary to being an intricate device to evade detection, the close connections between the participants made it easier to detect the fraud.

It is not uncommon for a district court to decline to apply the sophisticated means enhancement in run of the mill mortgage frauds.  *See e,g., United States v. Winston Shillingford*, Case No. 3:11-CR-00201-AWT (D. Conn 2014) (dkt #54) (no sophisticated means enhancement where defendant conspired with others to obtain fraudulent mortgages involving 40 multi-family homes through the use of fraudulent loan applications including false earnings statements and bank records); *United States v. Fillipos Milios*, Case No. 3:13-CR-00159-AWT (D. Conn. 2013) *Sentencing Memorandum* (dkt # 199) (no sophisticated means enhancement for leader or organizer of a mortgage fraud scheme who recruited straw buyers, submitted fraudulent loan documents including false HUD-1 settlement statements, employment and rental verification letters and payment of funds to recruiters, brokers and borrowers).  Mr. Scott's alleged scheme was no more complex or intricate than the schemes employed in *Shillingford or Milios* and accordingly should not warrant the sophisticated means enhancement.

For these reasons, the sophisticated means enhancement does not apply.

**D.**      **Role in the Offense**

The enhancement for an aggravating role only applies where the defendant exercised control "over *participants* in the" fraud and cannot be applied based on Mr. Scott's "control over the *activities* of the criminal enterprise." *United States v. Ramos-Paulino*, 488 F.3d 459, 464 (1st Cir. 2007) (emphasis in original); *see also United States v. Carrero-Hernandez*, 643 F.3d 344, 350-51 (1st Cir. 2011) (an aggravating role enhancement for being an organizer requires coordination of participants, not criminal activities). The fact that a defendant plays "an essential role" in the criminal activity is not sufficient to find that an aggravating role enhancement applies. *United States v. Sostre*, 967 F.2d 728, 733 (1st Cir. 1992). "Leader" implicitly requires that the mortgage fraud scheme involve participants who are "underlings or subordinates." *United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir. 1990). As a result, this requires the government establish by a preponderance of the evidence that Mr. Scott "exercise[d] some degree of dominance or power" over the participants and that he had "the authority to ensure that others w[ould] follow [his] orders." *Appolon*, 695 F.3d at 70.

There is insufficient evidence that Mr. Scott organized or exercised authority and control over any participant in the mortgage fraud scheme. The government labels, and the PSR adopts, Mr. Scott as the "mastermind" of this scheme.  The PSR then applies a four-level enhancement for Mr. Scott being a leader and/or organizer. However, "mere inclusion in the PSR does not convert facts lacking an adequate factual basis with sufficient indicia of reliability into facts a district court may rely upon at sentencing," *United States v. Harris*, 702 F.3d 226, 230 n.2 (5th Cir. 2012) (per curiam), and titles such as "mastermind" are not controlling, USSG §3B1.1, comment. (n.4).

The PSR does not identify the evidence showing that Mr. Scott coordinated or exercised control over any participant. The PSR implicitly relies on Mr. Scott's actions in "recruiting"

buyers, *see* PSR at ¶ 11, but any control or coordination of these individuals cannot support applying the enhancement because these buyers are not criminal participants. USSG §3B1.1, comment. (n.1) (requiring an individual be criminally culpable for their actions to qualify as a participant). As to the actual participants, the government's version of the offense equally attributes all participants' actions as *working with* the others to accomplish the fraud. *See* ¶ 9 (Mr. Scott "worked with…others who recruited" buyers); ¶ 12 ("the defendants worked with a complicit loan originator…bank insiders…and the complicit closing attorney"); ¶ 13 (Mr. "Scott, Fowler, and Raetz worked with Anderson to pass false information on to lenders" and Mr. Scott "worked with Anderson to hide the lack of buyer funds"); ¶ 17 (Mr. "Scott worked with Anderson to hide the lack of buyer funds"). Moreover, the PSR explicitly did not find Mr. Scott exercised control over participants. PSR at ¶¶ 25 & 26.

The PSR's assertion that Mr. Scott "organiz[ed] all of the actions of the co-conspirators to ensure closings occurred" lacks an evidentiary basis and cannot support an aggravating role adjustment. Even if Mr. Scott organized closings or sales, these are activities and as such demonstrate nothing regarding coordination of participants. *See United States v. Sostre*, 967 F.2d 728, 733 (1st Cir. 1992) (vacating sentence because a defendant does not play an aggravating role by bringing together potential buyers and sellers); *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994) (vacating the sentence where defendant supplying drugs and negotiating the terms of sale did not justify finding the defendant was a manager or supervisor, because these things do not indicate that the individual has a greater responsibility for the criminal operation and selling drugs makes the seller no more a manager than buying the drugs makes the buyer a manager). Accounts of witnesses interviewed by the government indicate that Mr. Scott did not control or organize participants. For example, Mr. Anderson would prepare documents for closings without

even talking with Mr. Scott. PSR at ¶ 44.  Indeed, the evidence produced by the government indicates, at best, that Mr. Scott worked "hand in glove" with other participants to execute the fraud, but this does not demonstrate that any participant was *subordinate* to Mr. Scott and cannot support an aggravating role enhancement.  *See Ramos-Paulino*, 488 F.3d at 464.

IV.   **DOWNWARD DEPARTURE**

A.   **Loss Overstates the Seriousness of the Offense**

Mr. Scott's case is one in which the offense level determined under the guidelines substantially overstates the seriousness of his offense conduct. USSG §2B1.1, comment. (n.20(C)). A downward departure is warranted. *United States v. Maldonado-Montalvo*, 356 F.3d 65, 69 (1st Cir. 2003) (Guidelines permit a downward departure where the total loss calculation overstates the seriousness of the offense). One circumstance where a downward departure may be warranted is where multiple factors, including but not limited to the defendant's actions, caused the ultimate loss.  *United States v. Carpenter*, 781 F.3d 599, 622 (1st Cir. 2015); *see also United States v. LaPoint*, 16 F. Supp. 3d 1006, 1009 (N.D. Iowa 2014) ("courts have identified a number of situaitons in which § 2B1.1 produces sentencing ranges that are too high…includ[ing]…the 'multiple causation' scenario, in which the amount of loss is determined to be the product of several sources (e.g., an economic downturn, a market collapse, or negligence by the victims), in addition to the defendant's conduct" (collecting cases)).

In *United States v. Gregorio*, 956 F.2d 341 (1st Cir. 1992), the First Circuit affirmed Judge Young's downward departure where a real estate broker pled guilty to eleven counts of filing false loan documents with a federally insured bank, because the loss overstated the seriousness of the offense. *Id*. at 341-45 (interpreting former USSG §2F1.1(b)(1), now consolidated at §2B1.1). The district court found a downward departure warranted based on the

multiple factors impacted upon the loss to the bank, including (1) the impact of the overall economy in the Northeast; (2) the banks conduct of either tacitly permitting or openly encouraging employee practices contrary to Fannie Mae's regulations; and (3) the length of time the bank retained ownership of the subject properties, thereby increasing the interest due on the loans. *Id.* at 345 & n.7.

Even if the Court adopts Mr. Scott's proposed loss calculation methodology, the seriousness of the offense as determined by the loss amount will still be overstated due to the multiple factors apart from Mr. Scott's conduct that contributed to the overall amount. The same factors that artificially inflated Mr. Gregorio's loss calculation in 1990 are present in Mr. Scott's case; including (1) an unprecedented economic crisis that devastated the American housing market around the time Mr. Scott's offense was detected; (2) lenders' conduct in packaging mortgages through predatory lending practices and eviscerating traditional borrowing qualifiers and underwriting processes in order to produce mass quantities of mortgages to sell to Wall Street on the secondary market; (3) steering borrowers to riskier, more expensive mortgage products to reap greater profits from the higher interest rates; and (4) the circumstances surrounding how the lenders' disposed of the collateral.

In the early 2000s, fueled by the technology bubble burst in 1999, financial brokers and investment banks began to enter the mortgage industry. *Inquiry Report*, 6 & 88. Wall Street was attracted to real estate to satiate investor demands for mortgage-backed securities that offered the promise of safe and secure returns. *Id.* The entry of Wall Street fundamentally altered the industry's business model from one in which lenders anticipated a long-term relationship with mortgagees into an "originate to distribute" model where mortgages were originated by banking

institutions not to service the loan through to its term, but rather to immediately sell into the security market. *Id*. at 89.

To meet Wall Street's demands for mortgages, the traditional 30-year fixed rate mortgage with a 20% down payment gave way to more exotic lending programs. *Id*. at 6-7; 104-06. Borrowers were offered packages involving such features as interest only payments for a set period of time during the beginning of a loan's maturation, adjustable rate mortgages with payments that would fluctuate based on a prevailing interest rate, or piggyback second mortgages for 100% or more financing. *Id*. at 104-10. These "innovating" products were key to continuing the increasing homeownership trend notwithstanding ever increasing prices in the real estate market. *Id*. at 104.

Beginning in 2005, the mortgage industry (including Fannie Mae and Freddie Mac) began supporting mortgage products that required very little or no down payment.[12] The Federal Housing Authority and others even proposed eliminating the borrower contribution requirement altogether. *Id*. Seller funded downpayment assistance organizations sprang up to provide prospective borrowers with their down payment in exchange for the seller promising to make a donation equivalent to the down payment to the organization.[13] FHA-insured loans with down payment assistance jumped from 35% in 2000 to 50% in 2004, much of which came from these seller funded programs. *Id*.

The means of determining borrowers' qualifications for a mortgage also changed to meet Wall Street's demand for mortgages with the proliferation of "reduced documentation" loans.

---

[12] GAO, *Mortgage Financing: Actions Needed to Help FHA Manage Risks from New Mortgage Loan Products*, 1 (February 2005) available at <http://www.gao.gov/new.items/d05194.pdf>

[13] GAO, *Seller-Funded Down-Payment Assistance Changes the Structure of the Purchase and Negatively Affects Loan Performance*, 1 (June 2007) available at <http://www.gao.gov/new.items/d071033t.pdf>.

From 2000 to 2007, these loans more than quadrupled their representative percentage in all outstanding loans. *Inquiry Report*, 110. Reduced documentation loans assured that there would be no verification of the borrowers' income or assets ("stated income, stated asset loans") or did not even require the borrowers to provide financial information at all ("no-doc" or "no income/no assets" (NINA) loans). *Id.* The industry collectively referred to such loans as "liar loans." *See id.* This was the industry in which Mr. Scott was operating his business in 2006 when the charged conduct began.

Another reason the loss is overstated is because it incorporates losses brought about by the actions of lenders. In these transactions, lenders were intentionally engaging in practices that increased the risk associated with these mortgages by using nonexistent or loose underwriting standards (piggyback second mortgages, liar's loans and NINA loans). *See* Attachment I. For example, Salem Five approved two mortgages for Ms. Hutchinson *within two weeks* of each other for a total of $458,750. The mortgages were approved without review or even verification of income or assets, but Salem Five did telephonically confirm her employment as a nursing assistant and verify through a website that a nursing assistant in her area has an average salary of $29,254. Amongst the charged loans, victim-lenders and the immediately preceding investors included Countrywide, Washington Mutual, Citimortgage, and Lehman Brothers.[14] All these lenders were intimately involved in the questionable and fraudulent activities exposed during the recession. These lending practices undoubtedly contributed to the extent of the loss in this case and thus overstate the seriousness of Mr. Scott's conduct.

---

[14] Professor William K. Black, testified to Congress that these actions indicate the lenders were engaging in systemic fraud. *See generally* Prepared Hearing Testimony before Senate Committee on *Examining Lending Discrimination Practices and Foreclosure Abuses*, (Mar. 7, 2012), available at <http://www.judiciary.senate.gov/imo/media/doc/12-3-7BlackTestimony.pdf>.

The third extraneous factor that may impact the loss in this case is the manner in which the properties were disposed of in foreclosures. In *Robers*, the Supreme Court noted, and the government agreed, that a victim's manner of disposing of collateral could break the proximate chain linking the loss to the defendant's offense. 134 S. Ct., 1854, 1859 (2014) ("a victim's donation of collateral or its sale to a friend for a nominal sum…could break the causal chain"). Here, there are considerable factors weighing against the reliability of the loss calculation as to the amount received from the collateral due to the nature of the dispositions. For example, 320 Warren Street, Unit 1 has a foreclosure deed with a date of October 22, 2008, but the resale deed relied on by the government reveals the foreclosed property was sold nearly five months prior on May 26, 2008.  The lender for 78-80 Granger Street, Unit 1 foreclosed in October 2008, but held onto the property for over 21 months only to quitclaim the property to an investor for $1, who then sold it to another individual. The government assigns a $60,000 amount for the disposition of all fourteen Salem Five properties, but does not provide the foreclosure deed for two of the properties and eleven properties were quitclaimed to the same investment company for $1 per property. Although bank owned properties sell for less, the Federal Reserve of Boston performed a study that found the price differential for these properties was approximately 29% less than the foreclosed value.[15] So, while the research suggests that 10 Navillus Terrace, Unit 3 would sell for 70% of the $258,750 loan, it was essentially given away for a $1 and then the government assigned it a $60,000 value—approximately $120,000 less than its expected resale value.  Mr. Scott's conduct may have caused a loss, but to hold Mr. Scott accountable for Salem Five's alleged $2,283,525 loss when it elected to resell the units for a nominal amount by essentially giving the fourteen properties away to an investor significantly overstates Mr. Scott's culpability.

---

[15] Kai-yan Lee, *Examining REO Sales and Price Discounts in Massachusetts*, Federal Reserve Bank of Boston at 59, available at < https://www.bostonfed.org/commdev/REO-and-vacant-properties/55-Lee.pdf>

In light of the unprecedented economic downturn, the lenders' actions in bringing about the extent of the loss in this case, and the lenders' decision to resell the properties at nominal prices, a downward departure is warranted in light of the loss calculation overstating the seriousness of Mr. Scott's offense. *See United States v. Brennick*, 134 F.3d 10, 15 (1st Cir. 1998) ("The notion in the fraud guideline that the loss table may under- or overstate the seriousness of the offense is little more than way of saying that departures from the loss table may be warranted for *good cause*.").

### B.    Substantial Assistance

Undersigned counsel and the Assistant U. S. Attorney have conferred regarding the question of substantial assistance.  The government takes the position that Mr. Scott does not qualify for a 5K1.1 motion, notwithstanding the considerable assistance that Mr. Scott provided to the government.  Mr. Scott contends that he has provided the government with substantial assistance, which has directly led to the prosecution and conviction of six individuals.  As set forth below, Mr. Scott requests that the Court consider this assistance he provided to the government as part of the Court's analysis of the factors delineated in 18 USC § 3553(a).

### V.    3553(a) ARGUMENT / PURPOSES OF SENTENCING

Even with Mr. Scott's alternative calculation, the recommended guideline range vastly overstates what is required in this case to achieve the legitimate objectives of sentencing under 18 U.S.C. § 3553(a). The Guidelines for fraud offenses have been widely criticized and discounted as a matter of course for having crossed the line from justifiable punishment into mere sadism.

### A.    <u>Cooperation Credit</u>

As this Court knows from the hearing on the Defendant's Motion in Limine or to Suppress Information, in his various proffer sessions with the government, Mr. Scott met with and proffered information to government agents on nineteen separate occasions between February 23, 2009 and December 11, 2009. As this Court has ruled, the statements and other information provided by Mr. Scott to the government in those sessions was protected by a proffer agreement and cannot be used directly against Mr. Scott in these criminal proceedings. The Court can, nevertheless, consider Mr. Scott's cooperation with the government as a § 3553(a) factor, even if the government fails or refuses to make a USSG §5K1.1 motion for a downward departure.  See United States v. Landron-Class, 696 F.3d 62, 77-78 (lst Cir. 2012) (listing cases).

Notwithstanding the government's refusal to file a §5K1.1 motion, Mr. Scott made multiple good faith attempts to cooperate with the government, and the information that he provided was used by the government to obtain the convictions of four people who played a role in the scheme charged in the indictment.  Mr. Scott's proffer session lead directly to the cooperation of Michael Anderson, who acted as closing attorney and settlement agent for many of the transactions set forth in the indictment.  Mr. Scott's proffer sessions revealed detailed information about Mr. Anderson's role in this scheme[16] and, on information and belief, the government used the information provided by Mr. Scott to convince Mr. Anderson to enter pleas of guilty on January 2, 2011, to a 27-count Information charging wire fraud, bank fraud and money laundering.  *See* PSR ¶ 7.

Mr. Scott's proffer sessions also provided the factual basis that the government used to obtain guilty pleas from Clarista Bramble and Arthur Samuels, two insiders at Bank of America. See PSR ¶ 7.  On information and belief, both Bramble and Samuels' guilty pleas came as a

---

[16] Mr. Scott provided detailed information about Mr. Anderson on February 23 & 26, March 5, May 7 & 15, June 2 & 9, July 8, and December 11, 2009.

result of information provided by Mr. Scott. Finally, Mr. Scott's proffer sessions provided part of the factual basis that the government used to obtain a guilty plea from Joan Ruggeiro, a competing real estate developer and sales agent in the Boston area. *See* PSR ¶ 8. On information and belief, Ms. Ruggeiro's guilty plea was also attributable to Mr. Scott's early attempts to cooperate with the government.

Despite his early and extraordinary cooperation, Mr. Scott has truly gotten the worst of both worlds. Information provided by Mr. Scott during the proffer sessions led the government to massive amounts of documents and other evidence, which the government made skillful use of by obtaining plea deals from Mr. Anderson, Mr. Samuels, Ms. Bramble, and Ms. Ruggeiro. By the end of 2009, when it came time for the parties to negotiate the terms of Mr. Scott's guilty plea, his cooperation had been lengthy and extensive. Nonetheless, the government presented Mr. Scott's then counsel with an offer Mr. Scott found to be overreaching and untruthful. Mr. Scott retained new counsel to advise him and, in the intervening time, the government turned to the people Mr. Scott had first identified in his proffers and away from Mr. Scott. The breach of trust between Mr. Scott and the government created an atmosphere where a fair deal could not be struck. Soon Mr. Scott became the focus of the entire investigation, in the process receiving zero credit for providing the information that proved critical to the successful prosecution of four culpable individuals.

In weighing the § 3553(a) factors, the Court can and should account for the prompt and extensive cooperation provided by Mr. Scott. *United States v. DeMonte*, 25 F.3d 343, 348-50 (affirming a district court's authority to depart downward , in the absence of a §5K1.1 motion, Where the defendant cooperated with the government by volunteering information that he had committed a crime that the government was unaware of). Specifically, the Court can and should

follow the rough rules of thumb that are applied by the United States Attorney's Office in this district and impose a sentence that is approximately 50% below the bottom of the applicable guideline range, which Mr. Scott calculates at 57 to 71 months – in other words, a sentence within the range of 24 to 36 months.

### B.    Unwarranted Disparity

Under 18 U.S.C. § 3553(a)(6), the sentence imposed by the Court should "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

Several mortgage fraud prosecutions have been brought in this district in the past decade involving substantially similar conduct and loss amounts.  In *United States v. Innarelli*, for example, the First Circuit affirmed a sentence of 72 months for the defendant, an attorney who worked with developers like Mr. Scott and mortgage brokers to perpetrate "land flips" by preparing and signing off on closing documents containing false information.  *See United States v. Innarelli*, 524 F.3d 286, 288-289 (1st Cir. 2008) (loss between $2.5 and $7 million; defendant pleaded guilty but did not cooperate).   Similarly, in *United States v. Sammon*, case no. 1:11-cr-10323, the Court imposed a 33-month sentence on a closing attorney/settlement agent involved with substantially similar conduct to that issue here, where the loss was between $2.5 and $7 million, and the defendant pleaded guilty but did not cooperate or provide assistance to the government.  Most recently, in *United States v. Foley*, the First Circuit affirmed a 72-month sentence for another closing attorney/settlement agent who worked with a seller/developer to prepare false HUD-1 settlement statements and other documentation.  *See United States v. Foley*, 783 F.3d 7, 11 (1st Cir. 2015) (loss between $2.5 and $7 million; defendant convicted after trial and did not cooperate).

As discussed in Part II, *supra.*, Mr. Scott acted as the property developer and seller of the condominiums at issue in this case. *See* PSR ¶ 53. As such, Mr. Scott's role is analogous to the role played by Elizabeth Reed in *Foley*. In that case, Ms. Reed purchased a 24-unit apartment building in Dorchester, converted those units to condominiums, and sold the condominiums to investors via various artifices, including assuring buyers that they "would not need to provide the remaining down payment at the loan closing." *Id.* at 10. To make good on that promise, Ms. Reed worked with Mr. Foley, the settlement agent and closing attorney who was "responsible for preparing the HUD-1 settlement statements . . . ." *Id.* at 10-11. Each of the HUD-1s at issue in *Foley* "indicated that the buyer had made a down payment at the loan closing. In fact, however, no such payments were ever made." *Id.* at 11.

Like Mr. Scott, Ms. Reed pleaded guilty to the charges against her (40 counts of wire fraud and 13 counts of money laundering), and cooperated against the closing attorney/settlement agent, leading to his conviction and 72-month sentence. Ms. Reed's guidelines range was 121 to 151 months. At the sentencing hearing, the government took the position that "the nature of the crime here, it's a very extensive mortgage fraud. It involved millions and millions of dollars. Fraudulent conduct involving false verifications of deposit, loan applications, creation of false documents and so forth. It's a very extensive crime." *See* Tr. at 3, attached at S. Nevertheless, the government recommended a below guideline sentence of 72 months, in part because "a crime of this kind, an economic crime, particularly a mortgage fraud is so driven by the loss number that the loss number has an overhanded application in a case like this." *See id.* at 4, 6-7. The government also likened Ms. Reed's role to another defendant, Robert Odimegwu, whom the government alleged:

> helped teach her how to conduct the kind of scheme with which she is specifically charged in this case, that is, buy a multi-unit building, immediately, virtually overnight

> convert it to condominiums, resell the individual units for a much higher price using
> straw buyers for whom she created false documents in order to get them to qualify for
> mortgage loans, promising them the kickbacks I mentioned, promising them they would
> pay no down payment, promising them they would not pay mortgages and that she would
> take care of all of those things, which she did do.

*Id.* at 5.  As reflected in the transcript, Mr. Odimegwu – who pleaded guilty but did not cooperate

with or assist the government – was sentenced to 60 months' incarceration.  *Id.* at 5-6.  After a

discussion at sidebar, the Court sentenced Ms. Reed to 18 months incarceration.  *See* Reed

Judgment, attached at T.

Mr. Scott and Ms. Reed are similarly situated with regard to their offense conduct, role in

the offense, acceptance of responsibility, and cooperation – key factors for this Court to consider

at sentencing.  Indeed, Mr. Odimedwu, whom the government conceded was similarly situated to

Ms. Reed, received a sentence of 60 months without any cooperation.  In light of the substantial

cooperation provided by Mr. Scott, a sentence within the range of 24 to 36 months is both

sufficient but not greater than necessary to satisfy the purposes of punishment and would avoid

unwarranted sentencing disparity.

### C.      Other Considerations

Additional reasons exist to support Mr. Scott's recommended sentence.  For example,

Mr. Scott's history of good works may be considered by the Court in fashioning a just sentence.

*Accord* USSG §5H1.11.  Mr. Scott has made the Boston metropolitan area his home since 1987.

As detailed in the letters from his church, he has served as church treasurer and organized events

designed to assist the church community.  *See* Letters, attached as J-R.  Most important is the

love and support Mr. Scott has provided to his family, including not only his wife and three

children, but also his mother and extended family members.

Mr. Scott has also served nearly seventeen months in pretrial detention.  Although he will receive a one-to-one credit for each day served, the Court can and should consider the well-recognized fact that time spent in pretrial detention is particularly hard, both because the heterogeneous nature of the inmate population creates heightened safety concerns and reduced opportunities for familial visitation, and because inmates on pretrial detention do not have the same access to programming, education, and employment as those who have been sentenced to prison for a set term.

In light of all of the foregoing, Mr. Scott submits that a sentence within the range of 24 to 36 months is sufficient in this case to satisfy the purposes of punishment.

## IV.      Request for Judicial Recommendation to Satellite Camp at FMC Devens

Mr. Scott respectfully requests that the Court consider a judicial recommendation to the Bureau of Prisons to designate Mr. Scott to the satellite prison camp at FMC Devens in Ayer, Massachusetts.  A designation to that satellite prison camp will keep Mr. Scott in Massachusetts and permit him to remain in close contact with his wife and young children as he serves the sentence imposed by the Court.  As the Court has seen from the letters submitted on Mr. Scott's behalf, he has a close and loving relationship with his children who, in turn, rely on him for love and support.  Due to the family's limited financial resources and the children's young ages, however, they will not be able to visit him should he be designated to an institution outside of Massachusetts.

As the PSR details, Mr. Scott is a first-time, nonviolent offender who is appropriate for placement at a prison camp.  Moreover, as the PSR makes clear, Mr. Scott suffers from several potentially life threatening medical conditions that require careful monitoring, including high blood pressure, diabetes and early renal failure.  See PSR at ¶ 120.  These conditions, if not

adequately treated, place him at high risk of serious events such as stroke and cardiac arrest.  See

PSR at ¶ 120.  FMC Devens is one of only three Bureau of Prisons medical centers in the

country.  The proximity to FMC Devens will afford Mr. Scott access to the type of emergent

medical care he may need in the event that complications develop during his period of

incarceration. In sum, not only is the satellite camp at FMC Devens the most convenient location

to allow for visitation with Mr. Scott's family, it is also the most appropriate for ensuring he

receives the medical care needed to treat his serious conditions.

For all of these reasons, counsel urges the Court to make a judicial

recommendation that Mr. Scott be designated to the satellite prison camp at FMC Devens.

## CONCLUSION

For all of the reasons set forth above, Mr. Scott requests that the Court impose a

sentence within the range of 24 to 36 months.

Respectfully submitted,

/s/ William H. Kettlewell_____
William H. Kettlewell (BBO #270320)
Sara E. Silva (BBO# 645293)
Gregory F. Noonan (BBO# 651035)
Melissa S. Baldwin (BBO# 690012)
Collora LLP
100 High Street
Boston, MA  02110
(617) 371-1000

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 21, 2015.

/s/William H. Kettlewell